**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| D.M. (Mother) and D.M. (Father), individually and on behalf of J.M. and D.P., : | CIVIL ACTION |
| Plaintiffs, : | |
| v. : | NO. 12-6762 |
| : | |
| COUNTY OF BERKS, et al., : | |
| : | |
| Defendants. : | |

## MEMORANDUM RE: DEFENDANTS' MOTION TO DISMISS AND MOTION FOR A MORE DEFINITE STATEMENT

**Baylson, J.**                                                                                                                   **March 14, 2013**

### I. INTRODUCTION

This action arose from Defendants' allegedly coerced removal of Plaintiffs' children from their home without a court order or post-deprivation hearing based on an anonymous report of child abuse. Plaintiffs, D.M. ("Mother") and D.M. ("Father"), have brought this action individually and on behalf of J.M., their adopted child; Mother has also brought the action on behalf of D.P., a child over whom she has legal and primary physical custody. (J.M. and D.P. will be referred to in this opinion as "the Children").

Plaintiffs allege that Defendants' actions violated their procedural and substantive due process rights under the Fourteenth Amendment, rights to association under the First Amendment, and rights to be free from unreasonable seizure and entry into their home under the Fourth Amendment. Currently before the Court are Defendants' Rule 12(b)(6) Motion to Dismiss and Rule 12(e) Motion for a More Definite Statement. (ECF No. 8). For the reasons that follow, the Court will DENY in part, and GRANT in part, Defendants' Motion to Dismiss, and DENY the Motion for a More Definite Statement.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs' Amended Complaint seeks redress under 42 U.S.C. § 1983 against the following Defendants: the County of Berks, a government entity that operates and manages Berks County Children and Youth Services ("BCCYS"); George Kovarie, BCCYS's Executive Director; Brandy M. Neider, BCCYS's Director of Intake; Wendy Kim Seidel, BCCYS's Director of In-Home Services; Barbara A. Jakubek, BCCYS's Director of Placement; Jennifer L. Grimes and Jennifer L. McCollum, Assistant County Solicitors for Berks County; Timothy M. Siminski, Lisa Marie Eshbach, and James J. Trupp, III, BCCYS Caseworker Supervisors; and Brandon M. Clinton and Kathleen A. High, BCCYS Caseworkers. Am. Compl. ¶¶ 6-13.

Plaintiffs base their federal claims on the following factual averments which, for the purpose of this motion, the Court must accept as true:

On July 20, 2012, BCCYS received an anonymous report from Parents' estranged adult daughter, Danielle. Id. ¶ 20. Danielle, who was engaged in a bitter custody dispute with Parents, told BCCYS that Father sexually abused her twenty years ago, when she was five years old or younger. Id. Three days after receiving this report, one or more of BCCYS's Supervisors and Directors instructed caseworker Brandon Clinton to visit Plaintiffs' home with the assistance of local police. Id. ¶ 21. At the direction of Supervisors Eshbach and Siminski, as well as other Supervisors and Directors, Clinton—accompanied by an armed and uniformed officer—"entered the premises [of Plaintiffs' home] without a warrant, the consent of anyone at the home, or any exigent circumstances." Id. ¶ 21. After entering the home, Clinton told Father (in person) and Mother (who was on the telephone) that BCCYS had received a report of suspected child abuse and that "if the Children were not placed outside of the home during the course of an investigation (the specific subject of which investigation was not disclosed to Parents) he would

2

immediately take the Children into protective custody and have them placed in foster care." Id. ¶ 23. Although Clinton did not have a court order authorizing BCCYS to remove the Children, the Parents—fearing that Children would be placed in foster care if they did not agree to Clinton's demand—agreed to place Children in the homes of friends and family for the course of BCCYS's investigation. Id. ¶¶ 28, 30, 59. The Children were then removed from Parents' home.

Prior to Clinton's visit to Plaintiffs' home on July 23, BCCYS's Directors and Supervisors, as well as Clinton himself, were aware that Parents "had regular visits to their home by trained agency workers while they were foster parents" and that their "foster children were regularly screened by the foster care agencies' case workers for signs of abuse or neglect, and no signs or evidence of any child abuse or neglect by Parents was ever indicated." Id. ¶ 31. Clinton, the Supervisors, and Directors, were also aware that "Danielle had made several previous false allegations of abuse against Parents . . ., all of which had been determined to be 'unfounded' upon investigation," and that Danielle was in a heated custody dispute with Parents over Danielle's child C.H. Id. ¶¶ 35, 38.

Shortly after the Children were sent to the homes of friends and family, Clinton interviewed J.M. without the Parents or an independent third party present. Id. ¶ 39. During the interview, J.M. stated "that he had never been abused or neglected by his Parents." Id. (emphasis omitted). Nevertheless, Clinton informed Parents after the interview "that they still could not have any contact whatsoever with either of the Children"; "no hearing, before a judge or master, informal or otherwise, was held within seventy-two (72) hours regarding the propriety of such removal." Id. ¶¶ 40, 43 (emphasis omitted).

3

On July 27, four days after Children were removed, Parents—along with their former attorney—attended a meeting at BCCYS's offices with Defendants Clinton (caseworker), Eshbach (caseworker supervisor), and Grimes (county attorney). Id. ¶ 41. At this meeting, the three Defendants informed Parents that "although Mother could have unrestricted visits with the Children, Father could still not have *any contact* with the Children." Id. The three Defendants also proposed a "Safety Plan," under which Children could return to Parents' home "on the conditions that, inter alia, Mother ensure that Father did not reside in the home and that Father not have any contact with Children during the course of the purported BCCYS investigation." Id. ¶ 42. The Parents refused to agree to this plan because it contained terms that, in their view, might be viewed as an admission that child abuse had occurred or was likely to occur in their home. Id.

On July 31, Mother took J.M. to a doctor due to her concern that J.M. was becoming depressed in his new home environment. Id. ¶ 44. After the doctor examined J.M., he "volunteered to write a letter to BCCYS regarding the adverse impact upon J.M. resulting from the forced separation from his Parents." Id. In his letter, the doctor stated:

> In review of [J.M.'s] medical records, and after speaking with both him and his mother, I feel it would be more detrimental for him to be separated from his parents. . . . I could find no evidence of any type of abuse or neglect on the part of either of his parents or any family members. Because of this, I am urging you to close any open case on this family and allow this child to return to stay with his family. I believe that the separation is causing more harm to him than anything else.

Id. ¶ 47.

On August 2, Father "voluntarily took a polygraph test, which determined that he was telling the truth when he stated that he never acted sexually inappropriate" with Danielle, or any of his other natural children. Id. ¶ 45. Parents immediately provided the results of this test to

4

BCCYS.  Id.  Shortly thereafter, Defendant Grimes emailed Parents' former attorney "demanding that Father have an 'evaluation,' which Parents reasonably took to mean a psychological evaluation."  Id. ¶ 48.  Father then paid for a psychological evaluation, which involved three separate consultations with a licensed psychologist (Dr. Williams).  Id.  Based on these consultations, Dr. Williams concluded that Father has "no obvious pathology or mental health diagnoses."  Id. ¶ 68.

On August 3, the Parents submitted a proposal to BCCYS that would allow Father to have supervised contact with the Children.  Id. ¶ 46.  Under the proposal, the Children would be permitted to stay at Parents' home on the weekends, but BCCYS would be permitted to make "spot checks" at any time.  Id.  BCCYS rejected this proposal; Mother persisted, however, in "repeatedly" writing to Grimes and BCCYS "requesting that Father be permitted to see his Children."  Id. ¶ 49.  These requests were "repeatedly denied and, whenever Mother would press for the reason why they were denied, Grimes and BCCYS would not respond."  Id.

On August 8, a representative from the Pennsylvania Department of Public Welfare (which oversees BYCCS and other children and youth services agencies) informed Parents that they "were being investigated pursuant to a 'general protective services report,' which, by definition, involves *non-serious injury or neglect*."  Id. ¶ 51 (emphasis added).

On August 9, eight of the individual Defendants—including four directors, two attorneys, and one caseworker supervisor—met to discuss Parents' case in the absence of Parents or their attorney.[1]  Id. ¶ 52.  At this meeting, Defendants determined that Father would need to "complete an 'offender evaluation' before he would be permitted to have any 'supervised contact' with the Children."  Id. ¶ 53.  Father initially refused to take an offender evaluation because, inter alia,

---

[1] The eight Defendants allegedly at the meeting were: Clinton, Grimes, Jakubek, Kovarie, McCollum, Neider, Seidel, and Siminski.

"an offender evaluation is intended for those who have already been convicted of a crime and Father had neither committed nor ever been convicted of any such crime." Id. ¶ 54. On August 22, after it became clear that Father could not have any contact with the Children until he received an offender evaluation, Father relented and contacted a doctor (Dr. Kirby) listed on the Pennsylvania Offenders Assessment Board's "provider list." Id. ¶ 56. Since Dr. Kirby told Father that he could not provide the evaluation until someone from BCCYS contacted him, Mother emailed Grimes later that same day requesting BCCYS contact Dr. Kirby. Id.

On August 29, a week after Mother emailed Grimes, Dr. Kirby informed parents that no one from BCCYS had contacted him. Id. This discovery prompted Parents to a write a detailed letter to Clinton and Grimes stating their intent "to bring their Children home." Id. ¶ 57. Parents, who brought the Children back home shortly thereafter, never received a response to this letter. The next day, however, they received a Petition to Compel. Id. ¶¶ 59, 60. The Petition, which BCCYS filed with the Berks County Court of Common Pleas, sought a court order requiring Parents to cooperate with BCCYS's "investigation" into suspected abuse of J.M., but not D.P. Id. ¶ 60.

On September 2, Parents received a phone call from Ms. High (a caseworker). Id. ¶ 65. High "stated that there was a 'plan' in place, and that the Children could not be in Parents' home." Id. When Mother informed High that Parents never signed the Safety Plan, "Ms. High demanded that Parents refrain from having either of the Children in the home and that they take J.M. back to the family member's home." Id. Fearing again that BCCYS would place the Children in foster care, the Parents "reluctantly complied with Ms. High's demands." Id. ¶ 67.

On September 12, an evidentiary hearing was held in a Berks county court to determine the merits of Defendants' Petition to Compel. Id. ¶ 69. At this hearing, the only witnesses that

6

testified for BCCYS were Danielle and Clinton, and Danielle's testimony was limited to her allegations of abuse from twenty years in the past. Id. No evidence corroborating Danielle's testimony, nor any evidence of other abuse, was introduced. Id. The judge, who granted BCCYS's petition, ruled that Children should be returned to Parents' home, and that BCCYS would have the right to make "unannounced case work visits." Id.

Throughout the course of the aforementioned events, "Mother contacted the Berks County Commissioners and Mr. Kovarie on many occasions and advised them of much of the foregoing acts and omissions of/by BCCYS and its employees." Id. ¶ 75. Neither the Commissioners, nor Kovarie, took any remedial action to address Parents' concerns. Id.

On January 11, 2013, Plaintiffs filed their Amended Complaint against Defendants. (ECF No. 5). Pursuant to 42 U.S.C. § 1983, Plaintiffs seek redress for alleged violations of their Fourteenth Amendment right to procedural and substantive due process; Fourth Amendment right to be free from unreasonable seizure and entry of the home; and First Amendment right to association. On January 25, 2013, Defendants filed a 12(b)(6) Motion to Dismiss all of Plaintiffs' claims, and an alternative Motion for a More Definite Statement. (ECF No. 8).

V. **LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While all factual allegations must be accepted as true, Erickson v. Pardus, 551 U.S. 89, 94 (2007), this requirement does not apply to legal conclusions, Iqbal, 556 U.S. at 678. A court must thus distinguish factual allegations from legal conclusions and assess if the factual allegations make out a "plausible claim for relief" for every legal claim asserted. Id. at 679.

## IV. DISCUSSION

### A. Substantive Due Process

Parents have a "constitutionally protected liberty interest[] . . . in the custody, care and management of their children." Croft v. Westmoreland Cnty. Children & Youth Servs., 103 F.2d 1123, 1125 (3d Cir. 1997). Although this right "does not include a right to remain free from child abuse investigations," the government has "no interest in protecting children from their parents unless it has some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." Id. at 1125-26. Absent reasonable suspicion, the coerced removal of children from their parents is an "arbitrary abuse[] of power" that violates substantive due process rights under the Fourteenth Amendment. Id. at 1126.

Here, Defendants argue that Plaintiffs' substantive due process claim should be dismissed because they were mandated by state law to investigate Danielle's allegation that Father sexually abused her when she was a child. According to Defendants, Danielle's report of abuse was based on her first-hand experience, and far different from the "six-fold hearsay report by an anonymous informant" that was held insufficient to warrant removal in Croft. See 103 F.3d at 1126-27. Plaintiffs counter by noting that (1) Danielle alleged abuse from twenty years in the past; (2) Defendants waited three days before going to Parents' home; (3) Defendants were aware that Danielle made similar allegations in the past, and that her previous claims had been determined to be "unfounded"; (4) Defendants knew that Danielle was in a fierce custody dispute with Parents that gave her a motive to lie; (5) Defendants had never found any signs of abuse or neglect among the foster children that had previously lived in Parents' home; and (6) Defendants had no evidence that Parents had abused the Children at issue in this dispute. Based on these

alleged facts, the Court finds that Plaintiffs have plausibly alleged that Defendants lacked reasonable suspicion that either J.M. or D.P. had "been abused or [were] in imminent danger of abuse." Croft, 103 F.2d at 1126.

**B.     Procedural Due Process Claim**

A recent opinion by the Third Circuit has made resolution of Plaintiffs' procedural due process claim rather straightforward. See B.S. v. Somerset Cnty., 704 F.3d 250, 271-73 (3d Cir. 2013). In B.S., the Third Circuit held that parents have a procedural due process right to "to be promptly heard" after the state forces the removal of their child. B.S., 704 F.3d at 273. The Third Circuit stated that this requirement is triggered "regardless of whether or not state law independently imposed that obligation,"[2] id. at 273, and irrespective of whether the state takes actual physical custody of the child, id. at 272. Although the Third Circuit did not "opine on the precise contours" of this right, it noted that delays in holding post-deprivation hearings "should ordinarily be measured in hours or days, not weeks" and that it was "obvious that a hearing 40 days later is not sufficiently prompt." Id. at 272 n.31. Here, Plaintiffs allege, inter alia,[3] that Defendants failed to provide a post-deprivation hearing for *over 40 days* following the coerced removal of their Children. Defendants' assertion that Parents' "volunteered" to remove the Children is based on reasoning that the Third Circuit has squarely rejected. See Croft, 103 F.3d at 1125 n.1 ("The threat that unless [father] left his home, the state would take his four-year-old

---

[2] As Defendants point out, Pennsylvania's Child Protective Services Law (CPSL) does not require a post-deprivation hearing if the children are not taken into the "actual physical custody" of the State. See Stone v. Brennan, No. 06-468, 2007 WL 1199376, at *5 (E.D. Pa. Apr. 19, 2007) (discussing 23 PA. CONST. STAT. § 6315(d)).

[3] Plaintiffs assert additional grounds for their procedural due process claim, including Defendants' failure to secure a court order or voluntary written separation agreement prior to the removal. It is unnecessary at this juncture for the Court to consider these additional grounds.

9

daughter and place her in foster care was blatantly coercive."). Plaintiffs have thus plausibly pled a procedural due process claim.[4]

C.      **First Amendment Right to Association**

The First Amendment protects "an individual's right to enter into and maintain intimate or private relationships free of state intrusion." Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh, 229 F.3d 435, 441 (3d Cir. 2000). Since "[f]amily relationships are the paradigmatic form of protected intimate associations," id., Parents' association with Children is a relationship that triggers protection under the First Amendment. Winston v. Children & Youth Servs. of Del., 948 F.2d 1380, 1390 (3d Cir. 1991); see also Doe v. Fayette County Children and Youth Servs., No. 8-823, 2010 WL 4854070 (W.D. Pa. Nov. 22, 2010) ("Where a policy interferes with core associational liberties, 'it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests.'" (quoting Zablocki v. Redhail, 434 U.S. 374, 388 (1978))). Here, Plaintiffs' allegations plausibly suggest that Defendants had less intrusive means of protecting Children than barring Parents from having *any contact or communication* with them, particularly given the dated nature of the alleged abuse, the absence of any evidence that Father abused either J.M. or D.P., the medical opinion from J.M.'s doctor that the forced separation was detrimental to J.M.'s health, the Parents' agreement to a supervised visitation plan for the duration of Defendants' investigation, and the county court's subsequent determinations that Children could be with Parents for the course of BCCYS's

---

[4] The Court finds no merit in Defendants' argument that Plaintiffs' claims are barred under Rooker-Feldman. As Plaintiffs correctly note, their "causes of action are not based on Defendants' filing of the Petition to Compel" and they "do not claim damages based on any court filings." Pl's Br. at 11 n.12; see B.S., 704 F.3d at 259-60. The Court also rejects Defendants' contention that Plaintiffs' claims are barred under Younger abstention doctrine because resolution of this matter will not interfere with an ongoing state proceeding. See Gwynedd Properties, Inc. v. Lower Gwynedd Tp., 970 F.2d 1195, 1201 (3d Cir. 1992).

10

investigation and that "unannounced case visits" would be a sufficient way to investigate the allegations.

## D.     Fourth Amendment: Unlawful Intrusion and Seizure

Plaintiffs allege two distinct violations of their Fourth Amendment rights: (1) an unlawful intrusion into their home, and (2) an unlawful seizure of the Children.[5] Plaintiffs base these claims on their allegations that Clinton (joined by an armed officer) entered Parents' home "without a warrant, the consent of anyone at the home, or any exigent circumstances,"[6] and, upon entering, coerced Parents into removing the Children for the course of BCCYS's investigation.[7] Am. Compl. ¶ 21. The Supreme Court has stated that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." Payton v. New York, 445 U.S. 573, 585-86 (1980); see also Hudson v. Michigan, 547 U.S. 586, 592 (2006) (holding that a police officer's "illegal *manner* of entry" into one's home is a "constitutional violation," albeit not one that triggers the exclusionary rule). Further, courts have held that the coerced removal of a child, even where the child is not taken into state custody, can be a seizure for Fourth Amendment purposes. See, e.g., Siliven v. Ind. Dep't of Child Servs., 635 F.3d 921, 926 (7th Cir. 2011); Wallis v. Spencer, 202 F.3d 1126, 1137 n.8 (9th Cir. 2000); Tenenbaum v. Williams, 193 F.3d 581, 604-05 (2d Cir. 1999). The Court is satisfied, therefore,

---

[5] Both Mother and Father have standing to bring this claim on behalf of J.M., and Mother has standing to bring this claim on behalf of D.P. See Southerland v. City of New York, 680 F.3d 127, 143 (2d. Cir. 2012) ("A Fourth Amendment child-seizure claim belongs only to the child, not to the parent, although a parent has standing to assert it on the child's behalf."). Whether or not Children's standing to bring a child-seizure claim under the Fourth Amendment precludes them from bringing claims under the Fourteenth Amendment is a question that has not been briefed by the parties. The Court will refrain from considering this issue at this juncture.

[6] Defendants claim that this averment is insufficiently specific because it merely alleges that Clinton entered Parents' home "without consent of *father*." Def's Br. at 22 (emphasis added). This is incorrect. As noted above, Plaintiffs allege that Clinton entered "without the consent of *anyone*." Am. Compl. ¶ 21 (emphasis added).

[7] Plaintiffs argue that another unlawful seizure occurred on September 2, 2012, when Ms. High threatened to place Children in foster care if Parents did not remove them from the home.

that Plaintiffs have pled sufficient allegations to make out plausible claims under the Fourth Amendment.

E.  **Defendant Liability**[8]

1.  **Monell Liability**

Defendants seek dismissal of Plaintiffs' claims against Berks County on the grounds that the Amended Complaint lacks a plausible factual basis for municipal liability per Monell v. N.Y. Dep't of Soc. Servs., 463 U.S. 658 (1978). The Court disagrees. Plaintiffs have plausibly alleged Monell liability on three separate grounds. First, Plaintiffs have plausibly alleged that a policymaking official (Kovarie) directed the actions underlying each of the four causes of action. See Am. Compl. ¶¶ 7, 15-16, 19, 52, 76, 84, 90, 96-98, 105; Fletcher v. O'Donnell, 867 F.2d 791, 793 (3d Cir. 1989) ("A single incident violating a constitutional right done by a governmental agency's highest policymaker for the activity in question may suffice to establish an official policy."). Second, Plaintiffs have plausibly alleged that policymaking officials acquiesced in all of the alleged unconstitutional conduct. See Am. Compl. ¶¶ 52, 75-76, 84, 90, 96-98, 105; City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988); ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."). Third, Plaintiffs' allegations of widespread involvement and acquiescence by directors, supervisors, attorneys, and caseworkers alike give "an air of probability" to their claim that the County was deliberately indifferent in its failure to train its employees. Oswald v. Gibbons, No. 10-6093, 2011 WL 2135619, at *4 (E.D. Pa. May 31, 2011); see also Gleason v. East Norriton Tp., No. 11-6273, 2012 WL 3024011, at *8 (E.D. Pa. July 24, 2012).

---

[8] Since Defendants have not raised a qualified immunity defense to Plaintiffs' claims, the Court will not address the possible merits of this defense here.

12

**2.      Supervisor Liability**

In order to find a supervisor liable under § 1983 for a subordinate's conduct, a plaintiff must show that the supervisor "participated in violating their rights, or that he directed others to violate them, or that he, as the person in charge . . . had knowledge of and acquiesced in his subordinates' violations." Baker v. Monroe Tp., 50 F.3d 1186, 1190-91 (3d Cir. 1995).  Here, Defendants seek dismissal of the claims against Eshbach, Kovarie, High,[9] Jakubek, McCollum, Neider, Seidel, Siminski, and Trupp on the grounds that Plaintiffs have only asserted liability against these individuals on the basis of their supervisory authority.  Contrary to Defendants' assertion, however, Plaintiffs' Complaint specifically alleges that these individuals[10] (a) directly participated in the alleged violations,[11] (b) directed others to commit the violations (Kovarie, Eshbach, and Siminski),[12] and/or (c) knew about, and acquiesced in, the violations.[13]  The one exception to this is Plaintiffs' allegation against Grimes, High, and McCollum for the illegal entry component of their Fourth Amendment claim.  Plaintiffs allege that Clinton entered Plaintiffs' home without a warrant "at the direction of Supervisors Eshbach and Siminski, and other of the Supervisors and Directors."  Am. Compl. ¶ 21.  By the Amended Complaint's own definition, this allegation would not encompass Grimes (attorney), McCollum (attorney), or High (caseworker).  See id. ¶¶ 7-13. Accordingly, the Court will grant Defendants' motion to dismiss Plaintiffs' illegal entry claim against these three Defendants.

---

[9] Although Defendants included High in their discussion of supervisory authority, Plaintiffs' Amended Complaint alleges that she is a caseworker, and not a supervisor.  Am. Compl. ¶ 13.
[10] The Court recognizes that Plaintiffs do not specifically mention Trupp (a caseworker supervisor) anywhere in the Amended Complaint, other than in the paragraph that identifies him as a Defendant.  The Amended Complaint, however, does provide a clear basis as to why Trupp was included as a party.  In a footnote on page six of the Amended Complaint, Plaintiffs note that the three caseworker supervisors that are Defendants in this action (which, by implication, includes Trupp) were each specifically referenced in Plaintiffs' BCCYS file.  While the Court recognizes, as do Plaintiffs, that discovery will be necessary to determine the extent, if any, of Trupp's involvement, Plaintiffs have pled enough factual allegations at this stage to proceed with their claims against Trupp.
[11] Am. Compl. ¶¶ 41-42, 48-50, 52, 53, 55, 57, 65-67.
[12] Id. ¶¶ 7, 15-16, 19, 25, 52, 76, 84, 90, 96-98, 105.
[13] Id. ¶¶ 49, 52, 58, 75, 76, 84, 90, 96-98, 105.

13

### 3. Absolute Immunity

Defendants assert that Grimes, McCollum, and Clinton are entitled to absolute immunity on Plaintiffs' First and Fourteenth Amendment claims. The Third Circuit, however, has held that absolute immunity for child welfare employees is not available for "investigative or administrative actions taken . . . outside the context of a judicial proceeding." B.S., 704 F.3d at 262 (quoting Ernst v. Child & Youth Servs. of Chester Cnty., 108 F.3d 486, 497 n.7 (3d Cir. 1997)). The actions of a child welfare employee only qualify for absolute immunity when they are prosecutorial in nature, such as when an employee "formulate[s] and present[s] . . . recommendations to the court with respect to a child's custody determination," particularly in circumstances requiring quick action to protect the child. Id. at 265 (quoting Ernst, 108 F.3d at 495). Here, the actions by Grimes, McCollum, and Clinton that form the basis of Plaintiffs' claims were clearly investigative in nature, and occurred in a context that allowed for non-hurried judgments. Accordingly, the "strong medicine" of absolute immunity is not warranted under the circumstances of this case.[14] See id. at 265 (quoting Forrester v. White, 484 U.S. 219, 230 (1988)).

### F. Plaintiffs' Anonymity

In their Motion for a More Definite Statement, Defendants request that Parents be disallowed from proceeding anonymously in this action. "[T]he decision whether to allow a plaintiff to proceed anonymously rests within the sound discretion of the court." Doe v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 371 n.2 (3d Cir. 2008). To help guide a district court's exercise of discretion, the Third Circuit has identified a list of non-exhaustive factors to consider. Doe v. Megless, 654 F.3d 404, 409-10 (3d Cir. 2011) (listing factors that favor and

---

[14] Defendants also assert immunity under 23 PA. CONST. STAT. § 6318. This statute, however, only provides immunity for alleged violations of *state* law, and is therefore immaterial to Plaintiffs' *federal* clai See Good v. Dauphin Cnty. Soc. Servs. for Children and Youth, 891 F.2d 1087, 1091.

disfavor anonymity). The Court recognizes that some of these factors militate against anonymity, particularly the fact Parents previously disclosed their identity in state defamation and custody disputes with Danielle.[15] The Court finds, however, that the totality of factors favor anonymity. First, Parents have a legitimate reason for anonymity as "[i]t is beyond argument" that an allegation of sexual abuse against a small child "is a highly sensitive issue" that would subject Parents to severe social stigma. Roe v. Borup, 500 F. Supp. 127, 130 (E.D. Wis. 1980). Second, disallowing anonymity would likely deter those who have been falsely accused of sexual abuse from vindicating their rights due to the stigma that invariably attaches from having one's name publicly attached to such a deplorable act. And, finally—and most importantly—both parties recognize that the Children have a clear right to remain anonymous in this proceeding. This protection, however, "would be eviscerated" if the Parents are not allowed to remain anonymous. See P.M. v. Evans-Brant Central Sch. Dist., No. 08-168A, 2008 WL 4379490, at *3 ("Since a parent must proceed on behalf of a minor child, the protection afforded to the minor would be eviscerated unless the parent was also permitted to proceed using initials.").

## VI. CONCLUSIONS

For the foregoing reasons, the Court will GRANT Defendants' Motion to Dismiss Plaintiffs' claim of illegal entry against Grimes, McCollum, and High, but DENY Defendants' Motion to Dismiss with respect to all other claims. The Court will also DENY Defendants' Motion for a More Definite Statement.

An appropriate order follows.

O:\CIVIL 12\12-6762 D.M. v. couty of berks\opinion_mtd.docx

---

[15] Unlike the present action, the Children were not parties in either the defamation or custody dispute. For the reasons discussed below, this is a significant distinction.