## TABLE OF CONTENTS

I.   BACKGROUND ........................................................................................................ 2

II.   STATEMENT OF FACTS ...................................................................................... 3

III.   PROCEDURAL HISTORY .................................................................................... 3

IV.   STANDARD OF REVIEW .................................................................................... 4

V.   ARGUMENT ........................................................................................................... 5

   A.   The Child Protective Service Law .................................................................... 5

   B.   Plaintiffs' 14th Amendment Procedural Due Process Claim Fails ...................... 6

      1.   *The Child Protective Services Law* .............................................................. 6

      2.   *Procedural Due Process* ............................................................................ 7

      3.   *Practical Implications and Reasonable Efforts* ........................................... 12

   C.   Plaintiffs' Substantive Due Process Claim Fails ............................................ 13

   D.   Plaintiffs' 4th Amendment Claims Fails.......................................................... 18

   E.   Plaintiffs' First Amendment Claim Fails ....................................................... 22

   F.   Plaintiffs' Claims for Supervisory Liability Must be Dismissed ..................... 24

      i.   George Kovarie ........................................................................................... 25

      ii.   Timothy Siminski ...................................................................................... 26

      iii.   Wendy Seidel,  Barbara Jakubek, Brandy Neider and Jennifer McCollu, ................. 27

      iv.   James Trupp and Lisa Eshbach ................................................................ 27

   G.   Defendants Are Entitled To Immunity ........................................................... 28

      1.   *Absolute Immunity* .................................................................................... 28

      2.   *Defendants Are Entitled to Qualified Immunity* ....................................... 32

   H.   D.P.'s Constitutional Claims ......................................................................... 36

   I.   Plaintiffs' Monell Claim Fails ....................................................................... 37

      1.   Policy, Practice or Custom ........................................................................ 38

      2.   Failure to Train ........................................................................................... 39

      3.   Final Policy Makers ................................................................................... 41

VI.   CONCLUSION ..................................................................................................... 42

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| D.M. (Mother) and D.M. (Father), | : | |
| Individually and on behalf of J.M. and D.P. | : | **CIVIL ACTION** |
| Plaintiffs, | : | **NO. 12-6762** |
| | : | |
| v. | : | |
| | : | |
| County Of Berks, Brandon Clinton, | : | |
| Timothy Simiski, Katy High, James Trupp, | : | |
| Lisa Eshbach, Jennifer Grimes, Wendy Seidel, | : | **JURY TRIAL DEMANDED** |
| George Kovarie and Brandy Neider, Barbara | : | |
| Jakubek and Jennifer McCollum | : | |
| Defendants. | : | |

_____

**BRIEF IN SUPPORT OF DEFENDANTS, THE COUNTY OF BERKS,
BRANDON CLINTON, TIMOTHY SIMINSKI, KATY HIGH, JAMES TRUPP, LISA
ESHBACH, JENNIFER GRIMES, WENDY SEIDEL, GEORGE KOVARIE, BRANDY
NEIDER, BARBARA JAKUBEK AND JENNIFER MCCOLLUM'S MOTION FOR
SUMMARY JUDGMENT**

Defendants, the County of Berks, Brandon Clinton, Timothy Siminski, Katy High, James

Trupp, Lisa Eshbach, Jennifer Grimes, Wendy Seidel, George Kovarie, Brandy Neider, Barbara

Jakubek and Jennifer McCollum, by and through their attorneys, The MacMain Law Group, LLC,

respectfully submit this Brief in Support of their Motion for Summary Judgment pursuant to Fed.

R. Civ. P. 56.

**I.      BACKGROUND**

Plaintiffs, D.M. father and D.M. mother, J.M. and D.P.'s claims in the present suit arise

from an investigation undertaken by BCCYS in July of 2012, following reports of abuse made by

Plaintiff D.M. father's now adult children when they were minors.   As mandated by the CPSL,

BCCYS conducted an investigation into the allegations which included both physical and sexual

assault.  During the investigation, the minor child, J.M., resided with his sister and D.P., resided

with his caretaker.  BCCYS made recommendations to the Plaintiffs in order to assess the safety of the minor children, however, they refused to participate in same.  As a result, a Petition to Compel participation in services was filed with the Court on August 17, 2012 regarding J.M. The Court ordered that the Plaintiffs permit BCCYS access to J.M. and BCCYS was ordered to conduct unannounced home visits.  A Petition to Compel regarding D.P. was filed on November 16, 2012. The Court ordered that Plaintiffs submit to offender evaluations that Plaintiffs permit BCCYS access to the child and that BCCYS was ordered to conduct unannounced home visits.[1]  As of the filing of this Motion BCCYS is no longer providing services to the Plaintiffs.

## II.    **STATEMENT OF FACTS**

In accordance with this Court's policies and procedures, a separate Statement of Undisputed Facts, with Exhibits attached, for which Defendants contend there is no genuine issue to be tried, is being filed contemporaneously with Defendants' Motion and is wholly incorporated herein by reference.

## III.   **PROCEDURAL HISTORY**

Plaintiffs initiated this action by filing their original Complaint on December 4, 2012 asserting various Constitutional claims against the County of Berks, Brandon Clinton, Timothy Siminski, Katy High, James Trupp, Lisa Eshbach, Jennifer Grimes, Wendy Seidel, George Kovarie, Brandy Neider, Barbara Jakubek and Jennifer McCollum.   Defendants filed a Motion to Dismiss and in response, Plaintiffs filed a First Amended Complaint.  Defendants filed a Motion to Dismiss the First Amended Complaint which was denied in part and granted in part on March 13, 2013.  On April 11, 2013, Defendants filed their Answer with Affirmative Defenses.

---

[1] Plaintiffs appealed the Order regarding D.P. to the Superior Court and the Superior Court vacated the Trial Court's Order.  A Petition for Allowance of appeal to the Supreme Court was been filed by BCCYS and was denied on March 5, 2014.

The parties have completed extensive discovery, including the depositions of the parties and non-party witnesses, and discovery ended on February 7, 2014.  Thus, this matter is ripe for summary judgment.

## IV.  STANDARD OF REVIEW

Summary judgment should be entered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c) (2010).  A fact is material when it affects the outcome of the suit under governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists when the evidence requires a fact finder to resolve the parties' differing versions of the truth at trial.  Id. at 249.  Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Id. at 247-48 (emphasis in original).

The standard for ruling on a motion for summary judgment as articulated by the Supreme Court in Celotex Corp. v. Catrett, 477 U.S. 317 (1986) is as follows:

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial.

Id. at 322.

"[I]t is proper for a district court to grant summary judgment when a plaintiff fails to produce any evidence on a necessary element of her claim."  Hernandez v. Borough of Palisades Park Police Dep't., 2003 U.S. App. LEXIS 1638 *1, *6-7 (3d Cir.)(citing Celotex, 477 U.S. at 323-25).  The plaintiff "need not try her case by carrying the burden of persuasion, but she must, at a minimum, produce evidence on every element of her claim."  Thus, the burden on the party

moving for summary judgment is not to show the "absence of a genuine issue of material fact,"

but rather to show "that there is an absence of evidence to support the non-moving party's case."

Celotex, 477 U.S. at 325.

## V.   ARGUMENT

### A.   The Child Protective Service Law

The purpose of the Child Protective Services law is:

> To encourage more complete reporting of suspected child abuse; to the extent permitted…to involve law enforcement agencies in responding to child abuse; and to establish in each county protective services for the purpose of investigating the reports swiftly and competently, providing protection for children from further abuse and providing rehabilitative services for children and parents involved so as to ensure the child's well-being and to preserve, stabilize and protect the integrity of family life wherever appropriate….

23 Pa.C.S.A. §6301(b).

**(b)  Efforts to prevent need for removal from home.--**In its effort to assist the child and the child's parents, pursuant to Federal regulations, the county agency will make reasonable efforts prior to the placement of a child in foster care to prevent or eliminate the need for removal of the child from his home and to make it possible for the child to return to home.

**County agency requirements for general protective services.**

**(i)  Protective custody.--**Pursuant to section 6315 (relating to taking child into protective custody) and after receipt of a court order, the county agency shall take a child into protective custody to protect the child from abuse or further neglect. No county agency worker may take custody of a child without judicial authorization based on the merits of the situation.

**(j)  Court action.--**If the county agency determines that protective services are in the best interest of a child and if an offer of those services is refused or if any other reason exists to warrant court action, the county agency shall initiate the appropriate court proceedings.

23 Pa.C.S.A. §6374

**B.**     **Plaintiffs' 14th Amendment Procedural Due Process Claim Fails**

Plaintiffs' procedural due process claim fails because BCCYS complied with the Child

Protective Services Law which governs the conduct of all CYS agencies in the Commonwealth

of Pennsylvania.  Plaintiffs' procedural due process claim also fails because the procedures

available to Plaintiffs under Pennsylvania law, and Defendants conduct investigating the original

report, constitute due process of law.

**1.**   *The Child Protective Services Law*

It is well settled that the statutory procedure required when the government assumes

custody of a child satisfies the 14th amendment requirements for procedural due process.  <u>Stone</u>

<u>v. Brennan</u>, 2007 WL 1199376 (E.D.Pa.); 23 Pa. Cons.Stat. Ann §6315; 42 Pa.Cons.Stat. Ann. §

6324.  Pursuant to the CPSL a child may be taken into protective custody pursuant to a court

order.  A child can also be taken without a court order, however, the child cannot remain in

protective custody longer than 72 hours without a hearing.  If the government does not take

actual physical custody over the child, but the child is living with a family or friend, a hearing is

not required.  <u>Stone</u> at *6.

In this case, the two minor children, J.M. and D.P. were not taken into protective custody,

therefore, the 72 hour hearing requirement of the CPSL did not apply and the Plaintiffs were not

deprived of any procedural due process rights.  Protective custody, pursuant to the CPSL is

defined as taking a child into  protective custody to protect the child from abuse or further

neglect after receipt of a court order.  <u>23 Pa.C.S.A. §6374(i)</u>.

Furthermore, as per the CPSL, "[I]f a County agency determines that protective services

are in the best interest of a child and if an offer of those services is refused or if any other reason

exists to warrant court action, the County **shall** initiate the appropriate court proceedings." 23
Pa.C.S.A. §6375(j). This is precisely what happened here.  BCCYS officials met with Plaintiffs,
in an effort to discuss services which were aimed at ultimately reuniting the family, and discuss a
safety plan and offender evaluation for Plaintiff, D.M. father, which Plaintiffs rejected. See,
Exhibit "N".  As such, BCCYS turned to the Court for intervention in filing the Petition to
Compel. At which time, the Plaintiff's received all of the process to which they were due.

    **2. *Procedural Due Process***

    To establish a procedural due process claim under § 1983, Plaintiffs must prove: (1) a
deprivation of an individual interest encompassed by the Fourteenth Amendment's protection of
life, liberty, or property, and (2) that the procedures available did not provide due process of law.
*See* Hill v. Borough of Kutztown, 455 F.3d 225, 233-34 (3d Cir. 2006).  To sustain a § 1983 claim
based upon a violation of procedural due process Plaintiffs "must, at a minimum, prove
recklessness or 'gross negligence' and in some instance may be required to show a 'deliberate
decision to deprive' the plaintiff of due process."  Jordan v. Fox, Rothschild, O'Brien & Frankel,
20 F.3d 1250, 1277 (3d Cir. 1994).

    There is no due process right to remain free from child abuse investigations.  Croft v.
Westmoreland County Children and Youth Services, 103 F.3d 1123, 1125 (3d Cir. 1997).[2]

    The Eastern District of Pennsylvania has specifically addressed the issue presented in
this case; placement of children outside the home following allegations of abuse.  In Purcelli v.
Houston 2000 WL 760522 (E.D.Pa 2000), there were allegations made by the children's father
that their step -father was abusing one of the children.  The father kept the children, however,
subsequently Bucks County Children and Youth Services allowed the mother to have the

---

[2] The Third Circuit did not rule that that the defendants violated plaintiffs' due process rights.

children in her custody.  However, CYS advised the mother that they would petition the court if she permitted the step-father to have contact with the children.  Therefore, the mother and children left the home.  The report of abuse was later determined to be unfounded and the children and mother returned home with the step-father.  The step-father, mother and children filed a federal civil rights suit alleging that their due process rights were violated.   The Plaintiffs' argued that the ultimatum, that the children would be taken away if they were around the step father, thereby forcing mother to leave the home, constituted removal of the child by the state without court approval and without a hearing.  The Court rejected this argument and held, if the state does not take actual physical custody then the due process procedures under the CPSL are not required.  Id at *12.

        In Brown v. Daniels, 2006 WL 2060647 (E.D.Pa. 2006), the Court again addressed a similar situation to the present case.  A child's maternal aunt took the child to Berks County Children and Youth Services for alleged injuries consistent with abuse.  Following an interview and examination, the child was removed from her mother and placed with the maternal grandmother.  The child's mother filed a lawsuit, however, defendants were given a directed verdict at trial because the child was living with the grandmother, the agency did not take actual physical custody of the child.  Therefore he was not in custody and the mother was not entitled to a hearing. Brown at *3.

        Again, in Stone v. Brennan, 2007 WL 1199376 (E.D.Pa.), Judge Rufe of the Eastern District held that when the state does not take actual physical custody of a child, a hearing is not required.  In Stone, the plaintiff's boyfriend was not permitted to live in the plaintiff's home and have unsupervised contact with her children based on a prior corruption of minors charge. Lancaster County Children and Youth Services (LCCYS) began an investigation into the family

because the plaintiff tested positive for marijuana after giving birth to the boyfriend's child.  It was then determined that the boyfriend was living at the home with the children.  The plaintiff was told to make alternative living arrangements for the children, or they would petition the court for custody.  The children stayed with friends and plaintiff's mother. [3]

Plaintiff filed a civil rights suit against LCCYS alleging that because she had to make alternative living arrangements for her children, they were removed from her custody illegally and she should have been afforded a hearing within 72 hours.  The Court rejected this argument and held if the government does not take the child, but the child is living with a relative or friend, a hearing is not required.  If plaintiff chose not to comply with the request that the children live somewhere else, removal would have occurred only after a motion was filed and an order entered.  Stone at *6.

The present case is directly on point with the Eastern District cases cited above.  BCCYS presented to the Plaintiffs' home to conduct an investigation into allegations of abuse made against Plaintiff, D.M. father.  As part of that investigation, BCCYS was required to ensure the safety of the children.  The Plaintiffs chose to have J.M. stay with his sister, Tammy Weaver and D.P. to stay with his caretaker, Paula Houck.  See, Exhibit "J" at 173-175.  It is undisputed that at no time did BCCYS take actual physical custody of the children.  As such, and as held repeatedly by the Eastern District, the procedural due process rights of the Plaintiffs were not violated.

Moreover, Plaintiffs were advised on numerous occasions from not only the BCCYS employees but also from the Office of Children Youth and Families of the Department of Public

---

[3]LCCYS ultimately filed dependency petitions for the children and they were removed from the plaintiff's custody.

Welfare that court proceedings were an option, and if they were not in agreement with the recommendations of BCCYS they could refuse to follow same and force BCCYS to petition the Court.  See, the deposition transcript of Jacqui Maddon at pages 136-137 and 143 attached hereto as Exhibit "W".  See, the deposition transcript of Roseann Perry at page 46 attached hereto as Exhibit "X".  In fact, Plaintiffs' engaged an attorney, Jackie Mark, Esquire who contacted BCCYS within two days of July 23, 2012.

Additionally, BCCYS and counsel for the Plaintiffs immediately were in contact following July 23, 2012 in an effort to resolve the case.  Following this contact, a meeting was held with Plaintiffs, Plaintiffs' attorney Jackie Mark, Esquire and BCCYS employees to continue to further the goal of working of making reasonable efforts prior to advancing the case to court. When it was determined that the Plaintiffs' were not interested in complying with the recommendations of BCCYS, they acted swiftly in filing a Petition to Compel and securing a hearing with the Court on their recommendations.

In a case out of the 7th Circuit, Dupuy v. Samuels, 465 F.3d 757 (7th Cir. 2006), the Court held that a safety plan is an offer and is not forced on parents, therefore there is no requirement for procedural safeguards, namely a hearing. The Court specifically held that threats to remove children from parents' custody do not equal coercion.  Id at 763.  The Court further held that a safety plan is a sensible partial solution to the difficult problem of balancing the rights of parents to the custody and control of children with the children's right to be protected against abuse and neglect.  Id at 764.  Additionally, in a subsequent decision the 7th Circuit held that if parents aren't coerced to sign a safety plan by being given false information as to the consequences of not signing, there is no need to require judicial review.  Dupuy v. McEwen, 495 F.3d 807, 808 (7th Cir. 2007).

10

Taking the rationale in <u>Dupuy</u> supra, Mr. Clinton advising the Plaintiffs that in the event they cannot find a suitable arrangement for the children, he could petition the Court is not false information that could result in coercion.  Explaining the procedure by which the caseworkers would follow if a family refused safety options is appropriate.  <u>See</u>, Exhibit "G" at page 117.  Furthermore, caseworkers are permitted to explain to parents that in the event they do not agree to a safety arrangement their case could be advanced to administration for court intervention. <u>See</u>, Exhibit "H" at page 57.

George Kovarie testified that that caseworkers are required to explain to parents the consequences of not following through with a proposed safety plan and advise a family that if they wish not to go forward with the safety plan they may have to advance their case to court. <u>See</u>, the deposition transcript of George Kovarie attached hereto as Exhibit "Y" at page 128-129. No threats were made other than what BCCYS is legally entitled to do if the Plaintiffs and Brandon Clinton could not find a suitable way to ensure the safety of the children.

Plaintiffs were also represented by counsel, Jackie Mark, Esquire beginning at Brandon Clinton's first contact with Plaintiff D.M. father on July 23, 2012 through August 13, 2012.  Ms. Mark was involved in the July 23, 2012 contact with Brandon Clinton by phone regarding the allegations made and the plan for the investigation of same and ensuring the safety of the children.  Further, after this initial contact, Ms. Mark stated she would have discussed with her clients what actions they would like to take and where they want their case to go.  <u>See,</u> deposition of Jackie Mark, Esquire at page 81 attached hereto as Exhibit "Z".  Moreover, her recommendation was for Plaintiff D.M. father to go stay somewhere else so the children could be in the home.  <u>See,</u> Exhibit "Z" at page 82.  Attorney Mark on July 25, 2012, contacted Jennifer Grimes to discuss making arrangements for the Plaintiffs to comply with the BCCYS

recommendations.  See, Exhibit "L".   Further she was present at a meeting at BCCYS with the Plaintiffs on July 27, 2012 where options for the family were discussed.

Attorney Mark, a family lawyer since 2001 who practices solely in Berks County clearly understands the various avenues available to families who become involved with BCCYS. Therefore, Plaintiffs attempts to now say they were not aware of the process available to them in light of the actions taken only 23, 2012 and thereafter when they were represented by counsel and advised by counsel of the avenues available to them is at best disingenuous.

Accordingly, summary judgment should be entered in favor of Defendants with respect to Count I of Plaintiffs' Complaint.

### 3.  *Practical Implications and Reasonable Efforts*

Not only does the Plaintiffs argument lack support in the case law and statutory regulations, but the practical implications of what Plaintiffs are asking this Court to hold would have a dramatic effect on the court system and the county agencies.

First, nothing would be voluntary.  County agencies would be in a position where any request made by a family to comply with recommendations would require a hearing.  A family would be in a position where instead of working with the agency and avoiding Court involvement, a family will be forced into the Court system unnecessarily and even involuntarily.  Additionally, this will significantly impact the court system.  County agencies, instead of working with families voluntarily, instead will be forced to simply file dependency petitions, in order to ensure that no constitutional rights of parents or children are being violated.  This will not only result in a clogging of the court's dockets but could result in more children being placed in foster care pending the outcome of investigations.  This would also result in families, who would otherwise agree to certain conditions, not even being given the opportunity to work with county agencies voluntarily

but instead be forced into the court system.[4]  Essentially, every family that has contact with any county agency would be required to go through the Court system, whether they want Court involvement or not.

Third, this would be in direct contradiction to the State and Federal requirements that *reasonable efforts* be made before a child is removed from the home.  Pursuant to the CPSL, 23 Pa.C.S.A. §6373, as more fully set forth above, a county agency must make reasonable efforts prior to seeking placement of a child in foster care to prevent or eliminate the need for removal of the child from his home and to make it possible for the child to return to home.  Immediately petitioning the Court, without making reasonable efforts to ensure that a child stays in their home, would place agencies in a position where they would be violating the regulations of the Child Protective Services Act and the Juvenile Act.

### C.    Plaintiffs' Substantive Due Process Claim Fails

Plaintiffs' substantive due process claim fails because there was reasonable and articulable evidence giving rise to a reasonable suspicion of abuse that prompted the investigation. The Third Circuit Court has stated that the standard to apply for substantive due process claims arising out of a custom, practice or policy is a "shock the conscience" standard. Studli v. Children & Youth and Families Central Regional Office, 346 Fed. Appx. 804, 812, (3d Cir. 2009).  Thus, "to support a substantive due process claim [whether it be a policy/protocol or an act by an official], the government conduct must be "so egregious, so

---

[4] Dauphin County has already determined that under no circumstance, will the county enter into voluntary placement agreements and no safety plan will be entered into until a court hearing is held within 3 days.  See a true and correct copy of the Dauphin County Children and Youth Services Safety Plan Protocol dated November 12, 2013 attached hereto as Exhibit "AA".  This is early evidence of the chilling effect these Middle District cases are having on county agencies ability to work with families.

outrageous, that it may fairly be said to shock the contemporary conscience." <u>Roberts v.</u>

<u>Mentzer</u>, 382 Fed. Appx. 158 (3d Cir. May 27, 2010) (citing, <u>Kaucher v. County of Bucks</u>, 455

F.3d 418, 425 (3d Cir. 2006)).  Moreover, Plaintiffs must show that the conduct of ***each***

***Defendant*** shocks the conscience, which means at a minimum, that each Defendant acted with

deliberate indifference to Plaintiffs' rights.  <u>See</u> <u>Estate of Smith</u>, 430 F.3d 140 (3d. Cir. 2005).

(finding that the shock the conscience standard is intentionally narrow, and that the plaintiff's

claims as to each defendant must stand or fall based on the conduct of each defendant

individually).

It is well established that parents have a constitutionally protected interest in the custody,

care and management of their children.  <u>See</u> <u>Lehr v. Robertson</u>, 463 U.S. 248 (1983).  However,

this right is not absolute.  <u>Id</u> at 256.  <u>See</u> <u>Croft</u>, 103 F.3d at 1125.  "When presented with

reasonably convincing evidence that a child faces the danger of physical or sexual abuse, the

government's interest in protecting the child outweighs a parents rights, and the parents' rights

may be infringed."  <u>See</u> <u>Stone</u> at *5.

In <u>Croft</u>, the Third Circuit clarified parents' constitutional rights during child abuse

investigations.  <u>See</u> <u>Croft,</u> 103 F.3d at 1127.  Specifically, the Third Circuit balanced the

fundamental interest in familial integrity with the state's interest in protecting children from

abuse.  <u>Id.</u> at 1125-1126.  While a child abuse investigation does not constitute a constitutional

deprivation, a constitutional deprivation can occur where there is no "reasonable and articulable

evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent

danger of abuse.  <u>Id.</u>  The central question was whether there is information available to the

investigating agency sufficient to create an objectively reasonable suspicion of abuse.  <u>Id.</u>  The

<u>Croft</u> Court held that anonymous tips alone do not provide reasonable grounds for removal of a

14

family member when there is no other independent evidence of reliability and in fact the evidence they do have is to the contrary.  Id at 1126.

Thus, a social worker's decision to separate the family constitutes a substantive due process violation only when it "reach[es] a level of gross negligence or arbitrariness that indeed 'shocks the conscience.'" Miller v. City of Phila., 174 F.3d 368, 375-76 (3d Cir. 1999). The Miller court, explained that "[t]o generate liability, executive action must be so ill-conceived or malicious that it 'shocks the conscience." Id  (quoting County of Sacramento v.  Lewis, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)).  The Third Circuit has held that for purposes of a substantive due process claims, negligence alone is not enough to shock the conscience under any circumstances.  Schieber v. City of Phila., 320 F.3d 409, 419 (3rd Cir. 2004).

A substantive due process violation can occur when there is an unstudied and thus unconstitutional decision to interfere with parental rights.  If a caseworker engages in a thorough and considered investigation of the report of child abuse, a Court cannot then conclude that a caseworker who obtained the requisite evidence "lacked objectively reasonable grounds to believe the child had been….abused" or that her actions could be said to be an "arbitrary abuse of government power." Starkey v. York County, 2012 WL 9509712 (M.D.Pa. 2012).

In, B.S. v Somerset County, 704 F.3d 250 (3d Cir. 2013), the Court declined to find a violation of the mother's substantive due process rights when a caseworker removed her child from the home.  A medical doctor who had been treating, the child determined that the child was being neglected based on her inadequate weight gain and failure to thrive while in the mother's care.  Based on this, the caseworker obtained an ex parte order from the court containing a

summary of the allegations and removed the child from the mother's care and placed her with the father.  Id at 256.

Plaintiff alleged that the summary of allegations made by the caseworker and submitted to the Judge for the ex-parte order, misrepresented information from the doctor, thereby violating her substantive due process rights.  The Court held that while the caseworkers actions "may not be free from fault, they cannot be said to shock the conscience."  Id at 268.  It was reasonable for the caseworker, based on the information from the doctor to protect the child until there was time to investigate further.  Id.

The landscape here is clearly distinguishable from Croft.  In Croft, the caseworker, upon receipt of an anonymous tip alone, with no further investigation or corroboration, required that plaintiff/father leave the home or the child would be removed.  Moreover, the child reported to the caseworker that she had never been abused.  Therefore, the Court held that based on this anonymous report alone, with no investigation, the caseworker had no reasonable basis to conclude that the child was being abused or in imminent danger of abuse justifying removal of plaintiff from the home.

This case is clearly distinguishable.  BCCYS received reports of abuse by 3 of the Plaintiffs' now adult children.  The allegations included abuse inflicted on them when they were minors.  Upon receiving these reports, Brandon Clinton interviewed two of the three children that were the subject of the reports. Both D.M. Daughter 1 and D.W. Daughter 2 reported that they were exposed to inappropriate sexual conduct in the Plaintiffs' bedroom.  D.W. Daughter 2 reported that Plaintiff D.M. father taught her how to masturbate using his water bed when she was 3 or 4 years old.  See, Exhibit "C".  D.W., Daughter 2 also reported that when she was 13 or 14, Plaintiffs would engage in sexual activity while she was in bed with them.  See Exhibit "C".

D.M. Daughter 1 reported that from the age of 5 until 10, Plaintiff D.M. father would touch her both on the inside and outside of her vagina, and that this would occur in his bedroom. <u>See</u>, BCCYS case notes Exhibit "D". Further, D.M. Daughter 1 reported that Plaintiff D.M. father had a paddle which he called the "Ultimator". This paddle had holes drilled into it and from when D.M. Daughter 1 was 6 until she was 11, Plaintiff D.M. father would hit her and her brother D.M. Son with it. <u>See</u>, Exhibit "D" and "K". After receiving consistent statements regarding the abuse they endured, Brandon Clinton presented to the home on July 23, 2012 to investigate the matter and assure the safety of the two minor children. [5] During the investigation the recommendation of BCCYS was to keep Plaintiff D.M. father and the minor children separate to further investigate and determine if the children were safe as required by the CPSL. Recommendations were made to Plaintiff D.M. father, which he chose not to follow, prolonging BCCYS' efforts and the separation with his children. When it became clear to BCCYS that the Plaintiffs were not willing to cooperate, a Petition to Compel was filed and heard on September 12, 2012.

BCCYS had independent, articulable and credible reports of abuse by three of Plaintiffs' grown children at the hands of Plaintiff D.M. father. Based on these reports and the fact that D.P., was under two years old at the time and J.M. was believed to be autistic, BCCYS had reasonable grounds to believe that the children in the home could be at risk for abuse or had been abused. As held in <u>B.S. v. Somerset County</u>, BCCYS was reasonable in protecting both J.M. and

---

[5] Brandon Clinton also interviewed the son of Plaintiff D.M. father, D.M. son, on July 25, 2012 who also provided a statement almost identical to that provided by D.M. daughter 1. He reported that his father had a paddle, which he called the "Eliminator". Plaintiff D.M. father drilled holes into the paddle and would "beat the crap" out of him. <u>See</u>, Exhibit "K".

D.P. based on the reports received from the Plaintiff D.M. father's three grown children until a further investigation could be done.

Therefore, Plaintiff's substantive due process rights were not violated and summary judgment should be granted as to Count II of Plaintiffs' Complaint.

### D.     Plaintiffs' 4th Amendment Claims Fails

Plaintiffs allege a violation of their 4th Amendments rights claiming that Brandon Clinton illegally entered their home without consent.

"Physical entry into the home is the chief evil against which the ... Fourth Amendment is directed." United States v. United States District Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 3134, 32 L.Ed.2d 752 (1972). "At the very core of the Fourth Amendment and the personal rights it secures stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 683, 5 L.Ed.2d 734 (1961).  While warrantless arrests in public places are valid, entry into a dwelling, even for purposes of an arrest for a serious crime, stands on an altogether different footing. "[A] greater burden is placed ... on officials who enter a home or dwelling without consent. Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment." Payton v. New York, 445 U.S. 573, 587, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1979), quoting Dorman v. United States, 435 F.2d 385, 389 (D.C.Cir.1970).

In Good v. Dauphin County Children and Youth Services, 891 F.2d 1087 (1989), the 3rd Circuit denied summary judgment filed by Defendants based on the allegations presented by Plaintiff.  Plaintiff alleged the caseworker and police officer banged on her door late at night, yelled at plaintiff, advised they could enter her home without a warrant and chased the child in an effort

to examine her.  The court held a jury could determine that the defendants should have known their conduct was unlawful.

Conversely, in Coleman v. State of New Jersey Division of Youth and Family Services, 246 F. Supp. 2d 384 (2003); the Court held that consent to enter the home precluded the plaintiffs' 4th Amendment claim.  Two caseworkers responded to plaintiffs' home to investigate a report of possible neglect of minor children.  Upon arriving at the home, plaintiff asked the caseworkers to wait outside a minute, put her two dogs away and allowed them to enter the home.  The caseworkers conducted a search of the home, interviewed the children and discussed the investigation with plaintiff.  The caseworkers then left the home, advising they would be back later to interview her husband.  Id at 387.  Plaintiff alleged a 4th Amendment claim against defendants arguing that consent was not voluntary because plaintiff did not specifically invite them in.  The Court rejected plaintiff's argument as the evidence established that plaintiff asked the caseworkers to wait a minute outside, put her dogs away and allowed the defendants into her home.  Furthermore, there was no evidence that plaintiff was incapable of giving consent or that she was threatened or coerced in any way.  Id at 392.  The Court, based on the totality of the circumstances, found that consent to enter the home with freely given.  Id.

The facts of this case are wholly contrary to those in Good and strikingly similar to those in Coleman.  Brandon Clinton and the Cumru Township police officer presented to the Plaintiffs' home on July 23, 2012 to investigate allegations of abuse against Plaintiff, D.M. father. [6]  It is the testimony of Defendant, Brandon Clinton that either Plaintiff D.M. father or his son, Kristopher Morganti answered the door, went back into the home, then returned coming outside

---

[6] Notably, Plaintiffs did not bring a 4th Amendment claim against the Cumru Township Police Officer.

on the phone, where they had a conversation outside of the home.  <u>See</u>, Exhibit "I" at page 118-119.  Mr. Clinton then got on the phone with Plaintiff D.M. mother to discuss the investigation.  At this point, they were all still outside.  <u>See</u>, Exhibit "I" at page 121.  Brandon Clinton did not enter the home, until it began to rain and Plaintiff D.M. father suggested they go inside. Mr. Clinton and the police officer were invited into the Plaintiffs' home by Plaintiff D.M. father.  <u>See</u>, Exhibit "I" at page 130-131.

Kristopher Morganti testified that he answered the door on July 23, 2012.  Mr. Clinton asked to speak with his parents.  <u>See</u>, the deposition testimony of Kristopher Morganti at page 63 attached hereto as Exhibit "BB".  He stated that Mr. Clinton and the officer at no time raised their voice to him.  <u>See</u>, Exhibit "BB" at page 65-66.  Plaintiff D.M. father further testified that he closed the door on Mr. Clinton and the officer when he went to get his father, but surveillance video of the home that he states he watched shows them walking into the home, to the living room.[7]  <u>See</u>, Exhibit "BB" at page 77.   Elizabeth Morganti, Kristopher's wife was also present in the Plaintiffs' home on July 23, 2012.  She testified that she and Kristopher discussed what occurred on July 23, 2012 with Plaintiffs.  She stated that Kristopher told Plaintiff, D.M. father that he could not remember if he let Brandon Clinton in or if he left the door open.  <u>See</u>, the deposition testimony of Elizabeth Morganti at page 42 attached hereto as Exhibit "CC".  Further, she testified that Kristopher told his father that he didn't invite them in but he was worried about whether he gestured for them to come in.  <u>See</u>, Exhibit "CC" at page 42-43.

_____

[7] While Plaintiffs' did provide surveillance video of July 23, 2012, there is no video evidence corroborating Kristopher Morganti's testimony, despite his testimony that he personally watched video of Brandon Clinton and the officer entering the home and that the videos are complete and copies of the video Plaintiff D.M. father took that day.  <u>See</u>, the surveillance video attached as Exhibit "DD".

Plaintiff D.M. father testified that on July 23, 2012, his son answered the door when Brandon Clinton and the officer knocked.  He then went to the front door and the officer and caseworker were standing in the entryway.  He asked them to step outside and he would talk to them.  See, Exhibit "J" at page 161.   Plaintiff D.M. father further testified that it began to rain; therefore, he invited Brandon Clinton and the officer into his home.  See Exhibit "J" at page 171.

Tammy Weaver, Plaintiffs' daughter and J.M.'s caretaker during the investigation testified that when she arrived at the home on July 23, 2012 to pick up J.M., Brandon Clinton and the Officer were outside the home.  See, the deposition transcript of Tammy Weaver at pages 50-51 attached hereto as Exhibit "EE".

Based on the totality of the circumstances, Brandon Clinton did not enter the Plaintiffs home without consent.  In fact, he did not enter the Plaintiffs home until being invited in by Plaintiff D.M. father.  Upon knocking on the door, he remained outside, even discussing the investigation with the Plaintiffs and the Plaintiffs' attorney, Jackie Mark on the phone all the while remaining outside.  It was not until it began to rain that Plaintiff D.M. father specifically invited Mr. Clinton into the home that he entered.  Moreover, even if taking Plaintiffs' assertions as true, that Brandon Clinton and the officer did step into the entryway on July 23, 2012, by Plaintiff D.M. father's own testimony, he asked them to step outside which they did and did not attempt to re-enter the home until Plaintiff D.M. father invited them in.  See, Exhibit "J".

At no time did Mr. Clinton attempt to force his way into the Plaintiffs' home, he did not make any threats in an attempt to gain access into the home and never asked to be permitted to enter the home.  The only reason Mr. Clinton went into the Plaintiffs' home was because he was specifically invited in by Plaintiff D.M. father.  Simply because Plaintiff D.M. father or Kristopher did not specifically invite Brandon Clinton or the officer into the home, the totality of

21

the circumstances indicate that Brandon Clinton did not illegally enter Plaintiffs' home and that consent was voluntarily given.  Therefore, they was no violation of the Plaintiffs' 4th amendment rights.

Accordingly, summary judgment should be granted as to Count III of Plaintiffs' Amended Complaint.

### E.    Plaintiffs' First Amendment Claim Fails

Plaintiffs allege a violation of their First Amendments right to familial association.  The Third Circuit has recognized that "family relationships are the paradigmatic form of protected intimate associations, as they 'by their nature involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences and beliefs but also distinctively personal aspects of one's life.'" Pi Lambda Phi Fraternity, Inc. v. University of Pittsburgh, 229 F.3d 435, 441-42 (quoting Roberts v. United States Jaycees, 468 U.S. 609, 619-20).

In Roberts, the United States Supreme Court noted that the United States Constitution imposes greater constraints on state power to regulate rights of intimate association than it does on state power to regulate a union or large organization's expressive association rights.  Roberts, 468 U.S. at 620. While the right to intimate association is not absolutely protected from state regulation, state regulation of intimate association is subject to strict scrutiny. See, Louisiana Debating & Literary Ass'n v. City of New Orleans, 42 F.3d 1483, 1498 (5th Cir. 1995), cert. denied 515 U.S. 1145, 115 S. Ct. 2583, 132 L. Ed. 2d 832 (1995). The defendant must show that: (1) the state action serves a compelling state interest which (2) cannot be achieved through "means significantly less restrictive of one's associational freedom." Id. As previously noted, Defendants have a compelling state interest in protecting children. *See* Croft, 103 F.3d at 1125.

The liberty interest in familial integrity is limited by the compelling governmental interest in the protection of children particularly where the children need to be protected from their own parents. <u>See</u>, <u>Myers v. Morris</u>, 810 F.2d 1437, 1462 (8th Cir.1987).The right to familial integrity, in other words, does not include a right to remain free from child abuse investigations. <u>Watterson v. Page</u>, 987 F.2d 1, 8 (1st Cir.1993).  A child services bureau may be justified in removing either a child or parent from the home, even where later investigation proves no abuse occurred. However, there must be some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse. *See*, <u>Croft</u> 103 F.3d at 1125.

In <u>Tomason v. SCAN Volunteer Services</u>, Inc., 85 F.3d 1365 (8th Cir. 1996), defendant received a report from a physician who opined, based upon his medical experience, that the mother was engaging in a life threatening child abuse, in the form of Munchausen Syndrome by Proxy. Based on this, a caseworker for defendant removed the child from the home and he was admitted to the hospital.  At an initial hearing on the removal, the Judge ordered the child to be returned home after 7 additional days in the hospital and that mother was to undergo counseling.  At the final hearing, approximately five weeks after the child was removed, the court dismissed the defendant's petition for the child to be kept in state custody finding insufficient evidence of abuse. <u>Id</u> at 1370-1371.  Plaintiffs thereafter filed a civil rights action against defendants for violation of their substantive due process rights.

The <u>Tomason</u> court found that based on the information they had from the physician, there was reasonable suspicion of abuse to justify some degree of interference with the plaintiffs' right as the parents of the child.  <u>Id</u> at 1372.

23

As already demonstrated, the Complaint alleges that BCCYS was investigating a report of abuse. It cannot be reasonably challenged that BCCYS is mandated under the CPSL to protect the children during the course of the investigation. *See* 23 Pa.C.S.A. §6375.  Moreover, BCCYS had reasonable and articulable evidence to give rise to reasonable suspicion that the minor Plaintiffs' had been abused or were in imminent danger of abuse.  BCCYS had three separate, credible and consistent reports from Plaintiff, D.M. father's grown children that they had all been abused.   All three reports contained specific and similar details of the abuse the grown children suffered by Plaintiff, D.M. father as children.  Based on these reports, BCCYS was mandated by law to investigate and assure the safety of the children in the Plaintiffs' home.

BCCYS has a compelling interest in assuring the safety of the children in the Plaintiffs' home.  Based on Plaintiffs' refusal to participate in the recommended services, there was no way for BCCYS to assure the safety of the children.  Therefore, BCCYS was justified to interfere in some degree with the Plaintiffs' rights.

Accordingly, summary judgment should be granted as to Count IV of Plaintiffs' Amended Complaint.

**F.    Plaintiffs' Claims for Supervisory Liability Must be Dismissed**

The only basis upon which Plaintiffs assert claims against George Kovarie, Barbara Jakubek, Jennifer McCollum, Brandy Neider, Wendy Seidel, Lisa Eshbach, James Trupp, Katy High, and Timothy Siminski are that they are "supervisors" and therefore they are liable for the alleged constitutional violations.  There have been no allegations and Plaintiff has produced no evidence that specifies their direct and personal roles in the alleged constitutional violations. George Kovarie is the director of BCCYS.  Barbara Jakubek is the Director of Placement, Jennifer McCollum is one of the Solicitors for BCCYS, Brandy Neider is Director of the Intake

Department, Wendy Seidel is the Director of In Home Services, Lisa Eshbach is the supervisor of the screening unit, James Trupp is a supervisor for In Home Services, and Timothy Siminski is a caseworker supervisor.

It is well settled that liability under §1983 is "personal in nature and can only follow personal involvement in the alleged wrongful conduct, shown through specific allegations of personal direction." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). "In order to find the supervisor liable under §1983," the Plaintiff must "show some affirmative conduct" by the supervisor "which played a role in the violation. Such personal conduct may be shown by demonstrating that [the supervisor] participated in violating the Plaintiffs' rights, or that he directed others to violate them, or that he, as the person in charge, . . . had knowledge of and acquiesced in his subordinate's violations." Baker v. Monroe Township, 50 F.3d 1186, 1190 (3d Cir. 1995). A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Center, 372 F.3d 572, 586 (3rd Cir.(Pa.) Jun 10, 2004) (NO. 03-3075) HN: 6 (F.3d). In addition, supervisory liability requires a causal connection between the supervisor's actions and the violation of Plaintiffs' rights. Id.; Shaw v. Stackhouse, 920 F.2d 1135, 1147 (3rd Cir. 1990); Sample v. Diecks, 885 F.2d 1099, 1118, (3rd Cir. 1989). Moreover, it is indisputable that Plaintiffs cannot pursue this claim against the Berks County or the "supervisors" under a theory of respondeat superior. Hill v. Wagner, 2010 WL 4273326, f.n. 2 (E.D. Pa., Kelly, 2010) citing Kimble v. Tennis, 2006 WL 1548950 (M.D. Pa., 2006); Rode v. Dellarciprete, 845 F.2d 1195 (3d. Cir. 1988).

### i. **George Kovarie**

George Kovarie, Director of BCCYS, was not involved in the July 23, 2012 investigation at the Plaintiff's home and does not know what occurred at the home on that day. See, Exhibit "Y" at 106-107 and 166. Additionally, while he was a part of the petition review meeting in his

role as Director, he had no knowledge or involvement as to whether contact between the minor children and Plaintiff D.M. father occurred or did not occur.  See Exhibit "Y" at page 113.  Mr. Kovarie testified that when it comes to the particulars of a given case, he defers to the judgments of his staff who service that particular case.  See Exhibit"Y"  at page 116.  George Kovarie, as the Director of BCCYS, while having knowledge with regard to the Plaintiffs' case and being involved in some aspects of the case, was not personally involved in any of the alleged acts which Plaintiffs claim were constitutional violations.  He was not present and not involved in the July 23, 2012 investigation.  He also had no knowledge of any decision regarding supervised visitation between the minor children and Plaintiff D.M. father.   Simply alleging that as the Director of BCCYS he is liable for every alleged act of any employee of BCCYS is ludicrous and not supported by the case law.

   **ii.**      **Timothy Siminski**

   Timothy Siminski is the supervisor of the sexual abuse unit in the intake department of BCCYS.  He was Brandon Clinton's supervisor on July 23, 2012.  He states that he had discussions with Brandon Clinton on July 23, 2012 of what Brandon should do when he presented to the Plaintiffs' home, including engaging the family in a safety plan to ensure the safety of the children.  See, Exhibit "G" at pages 95-96.   Mr. Siminski was also on the phone with Brandon Clinton while he was at the Plaintiffs' home and that numerous options were discussed, none which were acceptable to the Plaintiffs.  See, Exhibit "G" at pages 113-115. With regard to the petition review meeting, there were discussions about supervised contact with the children and Plaintiff D.M. father, however, it was the position of the Solicitor that they would request no contact until an offender evaluation was done and the case was advanced to

Court.  See, Exhibit "G" at page 131.  Therefore, Timothy Siminksi had no direct involvement in the July 23, 2012 contact with Plaintiffs and subsequent investigation and must be dismissed.

    **iii.**    **Wendy Seidel,  Barbara Jakubek, Brandy Neider and Jennifer McCollum,**

       With regard to the other Defendants, Wendy Seidel, Barbara Jakubek, Brandy Neider and Jennifer McCollum, their sole involvement in the Plaintiffs' case was that they were present for the Petition Review Meeting on August 9, 2012. [8] The petition review meeting was held to discuss the investigation and consider whether a Motion to Compel was to be filed.  These Defendants had no information other than what Brandon Clinton presented to them at the Petition Review, which was that Plaintiffs were not cooperating in the investigation.  Plaintiffs were not present and did not present any information or evidence at the Petition Review Meeting, therefore, the only information available was undisputed.  Moreover, there has been no evidence presented by Plaintiffs that any of these Defendants participated in any activity that alleged violated the Plaintiffs' rights.  The sole allegations against these Defendants are that they are supervisors at BCCYS and are therefore liable.  As this is not a sufficient basis for liability, they must be dismissed.

    **iv.**    **James Trupp and Lisa Eshbach**

       Lisa Eshbach is the supervisor of the screening unit, James Trupp is a supervisor for In Home Services.  Neither of these Defendants had a direct and personal roles in the alleged constitutional violations.  In fact, neither James Trupp nor Lisa Eshbach were even present for the Petition Review Meeting or any other proceeding regarding the Plaintiffs.  They are named solely because they hold supervisory roles at BCCYS.  Therefore, they must be dismissed.

---

[8] Notably, although Jacqui Madden and Brian Waugh were also present at the Petition Review Meeting, they were not named as Defendants.

G.     **Defendants Are Entitled To Immunity**

    *1.   Absolute Immunity*

The application of absolute immunity in this context originates from the doctrine of absolute prosecutorial immunity as announced by the Supreme Court in Imbler v. Pachtman, 424 U.S. 409, 418, 47 L. Ed. 2d 128, 96 S. Ct. 984 (1976). In Imbler, the Court considered various public policy considerations in granting absolute immunity to prosecutors including: 1) the possibility of compromising the prosecutor's independent judgment if faced with personal liability; 2) the likelihood that the prosecutor would be diverted from his duties if faced with defending against lawsuits arising from their decision making; 3) the particular difficulty in defending against civil rights claims for prosecutors given the nature of their decision-making functions in the judicial process and 4) the impact on the judicial process in the likely event that a prosecutor's decision making process is altered by the threat of being personally liable for his decision-making; 5) failure to afford absolute immunity may weaken the fairness of the judicial process; and 6) the judicial and professional responsibility review are sufficient to deter and punish the errant prosecutor  Id. 424 U.S. at 424-25.

Social welfare caseworkers and solicitors are entitled to absolute immunity for their actions on behalf of the state in preparing for, initiating, and prosecuting dependency proceedings. Millspaugh v. County Dep't of Pub. Welfare of Wabash County, 937 F.2d 1172, 1176 (7th Cir.1991); Vosburg v. Department of Soc. Servs., 884 F.2d 133, 135 (4th Cir.1989); Salyer v. Patrick, 874 F.2d 374, 378 (6th Cir. 1989).  Like prosecutors, "social workers must make a quick decision based on perhaps incomplete information as to whether or not to commence investigations and initiate proceedings against parents who may have abused their children." Ernst v. Child and Youth Services of Chester County, 108 F.3d 486 (3d Cir.1997) quoting Meyers v. Contra Costa

Cnty. Dep't of Soc. Servs., 812 F.2d 1154, 1157 (9th Cir.1987).   Further, the initiation of

dependency proceedings is not required in order to invoke absolute immunity.  B.S. v. Somerset

County, 704 F.3d 250 (3Rd Cir. 2013).  The same sort of protection offered to caseworkers who

file dependency petition must be extended with respect to a caseworker's function of seeking

judicial orders relating to custody of a child.  Id at 265.  Further, absolute immunity for child

welfare worker employees "is appropriate when the employee is question "formulates and presents

recommendations to the court" with regard to a child's custody determination, even of those

recommendations are outside the context of a dependency proceeding"  Id, citing, Ernst at 495.

A caseworkers' judgment should not be compromised by exposing them to the chilling

effect of §1983 liability.  Ernst at 496.  Therefore, allegations against child welfare workers and

attorneys who represent the agency are entitled to absolute immunity in connection with the

formulation and presentation of recommendations to a state court regarding a child's status and

disposition.  Id at 497.

> Applying the principles set forth in Butz, Imbler, and their progeny to the instant case,
> we hold that the CYS defendants are entitled to absolute immunity for their actions on
> behalf of the state in preparing for, initiating, and prosecuting dependency proceedings.
> Their immunity is broad enough to include the formulation and presentation of
> recommendations to the court in the course of such proceedings. We reach this
> conclusion because (1) the functions performed by the CYS defendants in dependency
> proceedings are closely analogous to the functions performed by prosecutors in criminal
> proceedings; (2) the public policy considerations that countenance immunity for
> prosecutors are applicable to child welfare workers performing these functions; and (3)
> dependency proceedings incorporate important safeguards that protect citizens from
> unconstitutional actions by child welfare workers.

Id. at 495.

Significantly, the Ernst court also recognized the inherent risks of the exposure of "CYS

Defendants" to retaliatory lawsuits for actions taken in their roles providing services. "In the

absence of absolute immunity, we would expect suits in retaliation for the initiation of dependency

proceedings to occur with even greater frequency than suits against prosecutors. Parents involved in seemingly unjustified dependency proceedings are likely to be even more resentful of state interference in the usually sacrosanct parent-child relationship than are defendants of criminal prosecution." Id. 496-467 *citing* Vosburg 884 F.2d at 137. *"*In turn, the likely frequency of such suits would result in a significant diversion of the energies of child welfare workers away from their official duties to the defense of § 1983 litigation" . . . and . . . . "defending against § 1983 actions would likely be as difficult for child welfare workers as it would be for prosecutors because child welfare workers, like prosecutors, must make quick decisions on the basis of limited information. Defending these decisions, often years after they are made, could impose unique and intolerable burdens on [child welfare workers] responsible annually for hundreds of [dependency and child abuse cases]." Imbler, 424 U.S. at 425-26,

Presently, all of the allegations against Jennifer Grimes and Jennifer McCollum, who are both solicitors for BCCYS surround the formulation and recommendations made to the Court with regard to the Petitions to Compel.[9]   Jennifer Grimes attended the July 27, 2012 meeting because Plaintiffs' attorney, Ms. Mark requested it.   Because their attorney requested the meeting, there was preparations made for any Court proceedings that would follow thereafter.  The meeting was an effort to demonstrate to the Court that BCCYS proceeded with reasonable efforts in working with the Plaintiffs'.   See, Exhibit "E" at page 120.   Therefore, they are entitled to absolute immunity from liability with respect to the constitutional claims against them.

---

[9] Jennifer McCollum, while present at the Petition Review Meeting, was not the solicitor assigned to the Plaintiffs' case and was only present in the room as she was waiting for the next meeting to take place.  Plaintiff presented no evidence that participated, or made any statements or recommendations regarding the Plaintiffs' case.

With regard to all the other named Defendants, Lisa Esbach, Wendy Seidel and Barbara Jakubek, Brandy Neider, George Kovarie and Timothy Siminski, their sole involvement in this action is their role as supervisor and administrators and their presence at the Petition Review Meeting on August 8, 2012.  A Petition Review meeting was held to determine whether to further Plaintiffs' case to court and what recommendations would be made to the court.  See Exhibit "E" at page 82;  See Exhibit "I" at page 54-55.  This involvement is for the sole purpose of formulating and presenting recommendations to the state court regarding J.M. and D.P.'s status and disposition, the exact type of function which is judicial in nature and require immunity.   Therefore, they are also entitled to absolute immunity.

With regard to Katy High, the allegations against her stem from her single involvement with the Plaintiffs on September 2, 2012.  On that date, Plaintiff D.M. mother brought J.M. home while Plaintiff D.M. father was present.   Katy High as the emergency duty caseworker was contacted as the call was made after hours.  She reached out to Brandon Clinton who advised her of the recommendations of BCCYS regarding the children and that a court hearing was scheduled for September 12, 2012.  Therefore, Ms. High expressed to Plaintiffs that they should have J.M. return to Tammy Weaver's home and address any concerns they have at their Court hearing.  See, Exhibit "U" at page 20-23.  Therefore, Ms. High's involvement and recommendations were in furtherance of the pending Petition to Compel court proceeding.  As a result, she is entitled to absolute immunity.

With regard to Brandon Clinton, he is entitled to absolute immunity for the procedural due process claims alleged against him.  Any constitutional violations alleged by Plaintiffs against Brandon Clinton regarding any acts by him performed in seeking the Court order regarding the Petition to Compel are immune.  Therefore, any acts at the Petition Review Meeting on August 8,

2012 and subsequent to that date in preparing the case for the Petition to Compel are immune.  Any recommendations made by him or statements made by him in furtherance of the Petitions to Compel filed by the agency are clearly intimately associated with the judicial process and done in furtherance of the presentation of the Petition to the Court.   As such, Brandon Clinton are entitled to absolute immunity for those actions.

## 2. *Defendants Are Entitled to Qualified Immunity*

Qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508 (2002). The defense of qualified immunity shields government officials from liability whenever "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." McGreevy v. Stoup, 413 F.3d 359, 364 (3d. Cir. 2005) *(quoting, Harlow v Fitzgerald, 457 U.S. 818 (1982)).  Qualified immunity is a question of law for the Court to decide early in the litigation process.   Grant v. City of Pittsburg, 98 F.3d 116, 122 (4d Cir. 1996), cert. denied Riccardi v. Grant, 532 U.S. 919 (2001).

In Curly v. Klem, 298 F.3d 271 (3d Cir.2002), the Third Circuit discussed the two-step inquiry that courts must undertake in determining whether a government official is entitled to qualified immunity.  "First, the court must decide whether the facts alleged show the officer's conduct violated a constitutional right."  Cox v. Hackett, 2006 WL 2129060 *8 (E.D. Pa. J. Baylson) *citing* Curly; *citing* Saucier, 533 U.S. at 201-02).  "If the facts, when viewed in the light most favorable to the plaintiff, do not show that the officer violated a constitutional right, then plaintiff's § 1983 claim must fail.  Id.  Second, the court must ask whether the right was clearly established at the time he acted.  "Clearly established" in this context means "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id.  In fact, the

Supreme Court in <u>Ashcroft v. al-Kidd</u>, 131 S.Ct. 2074, 2084 (U.S. 2011), held that an official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of the right are so sufficiently clear that "**every reasonable official would have understood that what he is doing violates that right**." (emphasis added).  Moreover, [as the Court in *Saucier*] noted, "this inquiry ... must be undertaken in light of the specific context of the case, not as a broad general proposition.  If a court concludes that an officer's conduct did violate a clearly established constitutional right, then it must deny him the protection afforded by qualified immunity." <u>See</u>, <u>Cox</u> citing <u>Curley</u>.  With regard to this second inquiry, courts should not deny summary judgment even if a material fact remains.  <u>Wilson v. Layne</u>, 526 U.S. 603, 119 S.Ct. 1692 (1999).  Summary judgment should be denied only when the law put the defendant on notice that his conduct was clearly unlawful.  <u>Id</u> at 202, 2156.

The Supreme Court has repeatedly stressed the importance of resolving qualified immunity at the earliest stage of the litigation to spare public officials of the burdens of litigation and trial. <u>Curly,</u> 298 F.3d at 277 (citing <u>Saucier,</u> 121 S.Ct. at 2156; <u>Hunter v. Bryant,</u> 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam); <u>Anderson v. Creighton,</u> 483 U.S. 635, 646, n. 6, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); <u>Harlow,</u> 457 U.S. at 818<u>)</u>).

"The ultimate issue is whether, despite the absence of a case applying established principles to the same facts, reasonable officials in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be lawful. Second, even where the officials clearly should have been aware of the governing legal principles, they are nevertheless entitled to immunity if based on the information available to them they could have believed their conduct would be consistent with those principles." <u>Good,</u> 891 F.2d at 1093 (1989). "Qualified immunity gives government officials breathing room to make reasonable but mistaken

judgments, and protects all but the plainly incompetent or those who knowingly violate the law." Stanton v. Sims, 134 S.Ct. 3 (2013) (per curiam).

Moreover, government officials are not required to know precedents of the Courts in their jurisdiction or those of the Supreme Court, to understand holdings from dicta, or understand precedents in order to draw the line in their own situations and encounters. Gonzalez v. City of Schenectady, 728 F.3d 149 C.A.2 (N.Y.) 2013. While they are expected to understand the black letter law applicable to commonly encountered situations, "they cannot be subjected to personal liability under § 1983 based on anything less." Id at 162. Police officers generally have a duty to know the basic elements of the laws they enforce, in circumstances when a police officer "neither knew nor should have known of the relevant legal standard," qualified immunity may still be granted." Harlow, 457 U.S. 818-819. Moreover, "there are circumstances wherein a police officer's violation of a law may be within the bounds of reason, even though the law in question can be said, from the comfort of an armchair, to be "clearly established."" Kelly v. Borough of Carlisle,  2013 WL 6069275, citing, Amore v. Novarro, 624 F.3d 522, 535–36 (2d Cir.2010).  In Amore, the Second Circuit held that even when a defendant violates a clearly established law, he may still be entitled to qualified immunity if he acts "deliberately and rationally in seeking to determine the then-valid, applicable and enforceable law." Id. at 535.

In the event that the Court determines that Plaintiffs have established a cognizable constitutional claim then the Court should still find that the Defendants are entitled to qualified immunity because a reasonable officer in the Defendants' position would not have known that his actions would have the effect of depriving someone of a constitutional right. McLaughlin v. Watson, 271 F.3d 566, 571 (3d. Cir. 2001), cert denied, 535 U.S. 989 (2002); Harlow 457 U.S. at 818 (1982). To determine reasonableness, a reviewing court must ask whether a reasonable person

could have believed Defendants' actions to be lawful in light of ***clearly established law*** and the information they possess.  Kornegay v. Cottingham, 120 F.3d 392, 396 (3d. Cir. 1997) (emphasis added).   As the Third Circuit has explained, this is a high hurdle for plaintiff to overcome because qualified immunity provides "ample protection to all but the plainly incompetent, or those who knowingly violate the law." Blackhawk v. Pennsylvania, 381 F.3d 202, 215 (3d. Cir. 2004).    "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.  Id.  Moreover, qualified immunity is not voided even if there is a failure to accurately determine what the law requires, unless that determination is clearly unreasonable.  Saucier, 533 U.S. at 205.

There is no case law in any federal court which prohibits BCCYS from working with a family in choosing to place their child(ren) with friends or a family member pending the investigation into allegations of child abuse.  In fact, the exact opposite is the case.  As discussed more fully supra, in Stone and Puricelli, the controlling law as of July 23, 2012, the Court held that if the state does not take custody of the child but the child is placed with a family member pending an investigation into reports of abuse, there is no hearing requirement.   In the absence of any other precedent, it cannot be argued that Plaintiffs had a "clearly established right" or that the Defendants were on notice that their conduct was "clearly unlawful."  BCCYS did not take custody of the child.  The Plaintiffs' opted, whether they claim it was coercion or not, to place the children with a friend, Paula Houck and their daughter, Tammy Weaver, therefore, there was no requirement that a hearing be held.

Moreover, even in Croft, the Court held that the caseworkers were entitled to qualified immunity based on their decision to proceed to court to petition that the child remain in foster care until the conclusion of the dependency proceedings.  See Croft at 103 F.3d at 1125.

BCCYS actions on July 23, 2012 were reasonable in light of the law of the CPSL and the controlling case law, therefore, they are entitled to qualified immunity and summary judgment should be entered in favor of the Defendants.

### H.      D.P.'s Constitutional Claims

It is well-established that parents have a constitutionally protected interest in the custody, care and management of their children.  <u>Lehr</u> 463 U.S. 248.  A parent's desire for and right to "the companionship, care, custody and management of his or her children" is an important interest that "undeniably warrants deference and, absent a powerful countervailing interest, protection." <u>Stanley v. Illinois,</u> 405 U.S. 645, 651, 92 S.Ct. 1208, 1212.

Pennsylvania has established a regulatory framework vesting foster parents with some liberty interest in the continued existence of their relationship with foster children through 55 Pa.Code § 3700.73, it does not rise to the level of a fundamental right meriting substantive due process protection.  The Supreme Court stated convincingly that "whatever emotional ties may develop between foster parent and foster child have their origins in an arrangement in which the State has been a partner from the outset." <u>Smith v. Organization of Foster Families for Equality and Reform</u>, 97 S.Ct. 2094 (1977).  This is in contrast to traditional family relationships whose origins are entirely apart from the power of the State, but are intrinsic to notions of freedom and liberty that are inherent in the very foundation of our country. In the end, the Supreme Court concluded that, at best, there is only a very limited constitutional liberty in a **foster** family, and that this liberty arises from a "knowingly assumed relationship with the State," and that state law sets the expectations and entitlements of the parties. <u>Id</u> at 2094.

To the extent that Plaintiffs' constitutional due process claims are associated with D.P., said claims fail because Plaintiffs do not allege that they are the parents of D.P.   The evidence

has established that Plaintiffs have custody of D.P., not that they are D.P.'s legal parents. Having custody does not provide Plaintiffs with constitutional rights equal to that of the parents. Smith v. Organization of Foster Families for Equality and Reform, 431 U.S. 816, 97 S. Ct. 2094, 53 L. Ed. 2d 14 (1977) (noting foster parents normally not afforded due process rights).

Therefore, summary judgment should be entered in favor of Defendants for Plaintiffs' claims as to D.P.

### I.      **Plaintiffs' Monell Claim Fails**

Plaintiffs do not set forth a separate Count in their Complaint for a claim of municipal liability against Berks County. However, at various locations throughout the Complaint Plaintiffs reference policies and practices of BCCYS and appear to be making a claim for municipal liability. Plaintiffs take a shot gun approach in asserting municipal liability.

A municipality can be held liable only where one of its employees is primarily liable under §1983. Monell v. New York Department of Social Services, 463 U.S. 658; 98 S.Ct. 2019 (1978);  Williams v. Borough of West Chester,  891 F.2d 458, 467 (3d Cir. 1989); City of Los Angeles v. Heller, 475 U.S. 796 (1986).   A municipality cannot be liable under §1983 under a theory of respondeat superior.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those edicts, or acts that may fairly be said to represent official policy, inflicts the injury, that the government as an entity is responsible under §1983. Monell 463 U.S. at 694.

In order to establish a constitutional claim against a municipality, Plaintiff must first establish a constitutional violation against one of its employees. Here Plaintiffs have failed to establish this element of their claim.  It is well-settled that if there was no violation in the first

place, then there can be no derivative municipal liability claim.  Los Angeles, 475 U.S. at 799

Estate of Smith v. Marasco, 318 F.3d 497, 505 (3d Cir. 2003).

Second, as this Court has recently held "in order to establish liability under *Section 1983*

against a local government unit or a supervisory official, a plaintiff must demonstrate: (1) the

deprivation of a constitutional right; (2) that the action was taken pursuant to a custom or policy

of the local government unit; and (3) that the action was the cause of the deprivation." Fry v.

Smoker et.,al. 2012 U.S. Dist. LEXIS 64939, *8 (E.D.Pa., Schiller, J.) *citing* Monell 436 U.S. at

691.

In the present case, Plaintiff's Complaint takes a shot gun approach to the allegation of

municipal liability against Berks County. In their Complaint Plaintiffs alleges that the purported

unconstitutional acts of the individual prison defendants were the result of a "municipal policy,

practice or custom.  See Exhibit "A".  Presently, Plaintiff has not supported these conclusory

allegations with any evidence.

      1.    **Policy, Practice or Custom**

In order to establish that a constitutional violation was the result of a "custom" Plaintiff

must establish evidence that the purported Constitutional violation (i.e.; unlawfully detaining an

inmate) was so well settled and permanent as to virtually constitute law. Bielevicz v. Dubinon,

915 F.2d 845, 850 (3rd. Cir. 1990). A municipal custom exists when "practices of state **officials**

[are] so permanent and well settled as to virtually constitute law." Beck v. City of Pittsburgh, 89

F.3d 966, 971 (3d Cir. 1996).

 Evidence of a "single incident by a lower level employee" is not sufficient to establish a

constitutional violation against a municipal entity. Fletcher v.  O'Donnell, 867 F.2d 791, 793 (3d

Cor. 1989). Plaintiff must come forward with evidence of a pattern of similar incidents and a failure

of the decision makers in the governmental body to respond properly to complaints about the inappropriate conduct. <u>Beck</u> at 971.

Plaintiffs have not identified a custom or policy for which BCCYS could be held liable under <u>Monell</u>.  It has been established that the requirements of the Child Protective Services Law is what is followed in Berks County.    There has been no evidence to establish that BCCYS had a policy that violates individuals' constitutional rights.  Moreover, there has been no evidence established that there have been any prior complaints or judgments against BCCYS similar to those as alleged in the Complaint.  Plaintiffs have not presented any evidence from any BCCYS policy-maker that would establish a "prior pattern of similar incidents and circumstances." <u>Montgomery v. De Simone</u>, 159 F.3d 120, 127 (3d Cir. 1998).

### 2.      **Failure to Train**

A municipality's failure to act, specifically a failure to train or supervise its officials adequately or failure to respond to complaints about the allegedly unconstitutional acts of employees, can also be an official policy subjecting it to §1983 liability.    <u>City of Canton v. Harris,</u> 489 U.S. 378, 388 (1989).   However, in order to establish a claim for municipal liability under a failure to train or supervise theory, the Plaintiff must present evidence that the local government itself was deliberately indifferent to the rights of persons "with whom the police come into contact."  <u>Id.</u>   "Only where failure to train reflects a deliberate **or conscious choice** by a municipality - a 'policy' as defined by our prior cases - can a City be liable for such a failure under §1983." <u>Id</u> at 389. (emphasis added*).*   "A conclusion that the failure to train was a result of deliberate indifference would be justified in at least two circumstances:  (1) A constitutional violation was a foreseeable consequence of, and very likely to occur as a result from, the failure to train adequately, i.e., there was an obvious need for more or different training, such as in the

case of the use of firearms or deadly force, and (2) the municipality <u>repeatedly</u> received similar complaints of constitutional violations by its Officers and still failed to act.   Id. at 390<u>; Board of County Commissioners of Bryan County v. Brown,</u> 520 U.S. 397, 407-408; <u>Carter v. City of Philadelphia,</u> 181 F.3d 339, 357 (3d Cir. 1999)(emphasis added).

Here, Plaintiffs cannot present any evidence to develop their claim against BCCYS for liability for a failure to train.  The training provided is under the direction and requirements of the Department of Public Welfare (DPW) and as per the requirements of the CPSL.  Indeed, the Commonwealth of Pennsylvania requires that every new caseworker be state-certified and receive at least one-hundred and twenty hours (120) hours of basic core training, including training on child abuse investigations within the first eighteen months of employment at programs across the state, as well as additional training that caseworkers must receive during each year of employment. <u>See,</u> Exhibit "W" at pages 101-102 and 133-134.  <u>See,</u> Exhibit "Y" at page 160-161.   Moreover, staff training is monitored by DPW, and BCCYS is required to report all staff training to DPW in order to maintain certification.   There is no dispute that the caseworkers at BCCYS are certified and have never lost their certification.

Additionally, BCCYS provides <u>every</u> caseworker with substantial training on how to conduct investigations relating to child abuse.  Training is also provided to caseworkers when new court decision come down that would apply to their cases.  <u>See,</u> Exhibit "E" at pages 15-19 Attorney Grimes will explain what the court decided, why the court decided the way they did and discuss issues related.  See Exhibit "E" at page 19.

There is simply no basis or evidence to support any inference that the BCCYS' adherence to Pennsylvania's statutory training requirements was in any way improper, let alone caused a constitutional deprivation of rights.  Further, there is no evidence of any prior complaints or

allegations against BCCYS of the same type or nature of Plaintiffs' complaint, and there is no evidence of any prior judgments against BCCYS stating that their procedures and/or training is legally insufficient.  Plaintiffs are unable to establish that BCCYS knew that employees were encountering this particular situation i.e., a family voluntarily placing children with family members, that employees of BCCYS have a history of mishandling that situation and the employee(s) wrong choice frequently causes a deprivation of constitutional rights.

Therefore, the evidence establishes that the BCCYS appropriately trained their caseworkers in the investigation of child abuse allegations, which included the option of families choosing to have children reside with family members pending the investigation as per the requirements of the CPSL and case law at the time.  According, summary judgment should be entered in favor of Defendants.

### 3.    <u>Final Policy Makers</u>

In order to establish municipal liability based upon the actions of an individual official or employee, Plaintiffs must show that the individual acted in the exercise of final policymaking authority, a final policymaker delegated to the individual authority to speak or act for the municipality, or a final policymaker ratified the individual's conduct or speech after it occurred. <u>Hill</u> 455 F.3d at 245; <u>McGreevy</u>, 413 F.3d at 367.

"Identifying a "'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." <u>Id.</u> at *9 quoting <u>Bd. of Cnty. Comm'rs of Bryan Cnty</u>. 520 U.S. at 403-04.  "An 'act performed pursuant to a 'custom' that has not been formally approved by an appropriate decision maker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the

41

force of law.'" Id. Furthermore, the Plaintiff must produce evidence that the alleged deliberate

conduct was the "moving force" that caused the constitutional injury. Id.

Plaintiff has not presented any evidence that a County policy is at issue in this case.  In

fact, Plaintiff has not even taken a Rule 30 deposition in order to explore the policies and

procedures of BCCYS.  Therefore, Plaintiffs have not established that any policymaking

decisions of the Defendants resulted in a constitutional violation.

Accordingly, Plaintiffs claim for municipal liability fails and must be dismissed.

## VI.   CONCLUSION

Based on the foregoing, Defendants, the County of Berks, Brandon Clinton, Timothy

Siminski, Katy High, James Trupp, Lisa Eshbach, Jennifer Grimes, Wendy Seidel, George

Kovarie, Brandy Neider, Barbara Jakubek and Jennifer McCollum, respectfully request that this

Court enter an Order granting summary judgment in favor of the Defendants and against

Plaintiffs, with prejudice, in accordance with Federal Rule of Civil Procedure 56.

Respectfully Submitted,

THE MACMAIN LAW GROUP, LLC

Dated: March 10, 2014                    By:  Matthew Connell /s/____
                                         Matthew J. Connell (PA No. 80246)
                                         Tricia M. Ambrose (PA No. 200411)
                                         The MacMain Law Group, LLC
                                         101 Lindenwood Drive
                                         Suite 160
                                         Malvern, PA 19355
                                         Attorneys for Defendants,County of Berks, Brandon
                                         Clinton, Timothy Siminski, Katy High, James
                                         Trupp, Lisa Eshbach, Jennifer Grimes, Wendy
                                         Seidel, George Kovarie, Brandy Neider, Barbara
                                         Jakubek and Jennifer McCollum

## CERTIFICATE OF SERVICE

I, Matthew J. Connell, Esquire, attorney for Defendants, hereby certify that a true and correct copy of within Motion for Summary Judgment was filed with the Court via electronic filing and served upon the following individual(s) via ecf/electronic filing this 10th day of March 2014.

I further certify that true and correct copies of the Exhibits were provided to the Court as per the Court's procedures and to counsel for Plaintiff via hand delivery and federal express mail as follows;

Judge Michael Baylson
United States District Court
Eastern District of PA
3810 U.S. Courthouse
601 Market Street
Philadelphia, PA 19106

Glenn S. Gitomer, Esquire
Benjamin R. Picker, Esquire
bpicker@mkbattorneys.com
McCausland Keen & Duckman
259 North Radnor-Chester Road
Radnor, Pennsylvania 19087

THE MACMAIN LAW GROUP, LLC

Dated:  March 10, 2014          /s/ Matthew J. Connell
                               Matthew J. Connell (PA No. 80246)
                               Tricia M. Ambrose (PA No. 200411)
                               101 Lindenwood Drive Suite 160
                               Malvern, PA 19355
                               484-318-7106
                               Attorneys for Defendants County of Berks, Brandon
                               Clinton Timothy Siminski, Katy High, James
                               Trupp, Lisa Eshbach, Jennifer Grimes, Wendy
                               Seidel, George Kovarie, Brandy Neider, Barbara
                               Jakubek and Jennifer McCollum