**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| D.M. (Mother) and D.M. (Father), individually and on behalf of J.M. and D.P., | : : | CIVIL ACTION |
| Plaintiffs, | : | |
| v. | : | NO. 12-6762 |
| | : | |
| COUNTY OF BERKS, et al., | : | |
| | : | |
| Defendants. | : | |

## <u>MEMORANDUM RE: MOTIONS FOR SUMMARY JUDGMENT</u>

**Baylson, J.**                                                                                          **June 20, 2014**

In this civil rights complaint, plaintiffs are parents and children who allege that the defendants, Berks County Children and Youth Services ("BCCYS") and various of its employees violated their civil rights by certain actions that were taken between July 23, 2012 and September 12, 2012.

Defendants move for summary judgment on all of Plaintiffs' claims against the Berks County Children and Youth Services (BCCYS), several BCCYS employees, and two assistant county solicitors related to removal of Parents' children from their home during the investigation of alleged child abuse. Plaintiffs move for partial summary judgment against individual defendants Brandon Clinton and Kathleen High for violation of their Fourteenth Amendment rights to procedural due process.

In order to enable the parties, and any other interested person, to better understand the various claims and defenses, as well as the legal discussion concerning the cross-motions for summary judgment, the Court will first indicate the primary topical issues presented and then summarize the roles of the various defendants.

**Topics for Legal Analysis**

       1.      What information was received by BCCYS prior to initiating their investigation, and whether this information supported a legally sufficient for the basis for the action which was taken?

       2.      What are the circumstances surrounding the entry into Plaintiffs' home on September 23, 2012.

       3.      Discussions among Defendant Clinton, the adult plaintiffs, and their attorney on the same date, concerning what could happen to the minor children of the adult plaintiffs.

       4.      What were the circumstances resulting in the removal of the children Plaintiffs' home, whether it was voluntary or involuntary, on the same date?

       5.      What discussions took place thereafter, in particular, what occurred during a meeting of various of the individual defendants employed by BCCYS on August 9, 2012?

       6.      What is the legal effect of a "petition to compel" filed in the Berks County Court of Common Pleas on August 16, 2012?

       7.      What are the circumstances where at least one of the defendants ordered the removal of J.M. from Plaintiffs' home on September 2, 2012?

       8.      As a result of the children being reunited with their parents on September 12, 2012, 51 days after the above incidents commenced, what legal claims do plaintiffs have and have defendants raised any defenses entitling them to summary judgment as a matter of law?

       As with all summary judgment cases, the Court must and will take the evidence in the light most favorable to the non-moving party.

In this case, plaintiffs have moved for partial summary judgment against two of the defendants arguing that there is no genuine dispute of facts and that these two defendants violated plaintiffs' rights under the 14th Amendment.

All defendants moved for summary judgment on all of plaintiffs' claims asserting that they had no liability for the acts or omissions which took place as summarized above.

The Court had oral argument in this case on June 10, 2014. At the oral argument, the Court noted the following issues concerning the following defendants:

1.    George Kovarie, Executive Director of BCCYS, present at August 9, meeting and approved actions that were taken thereafter.

2.    Brandy Neider, Director of Intake at BCCYS who was also present at the meeting on August 9, and approved the actions which were taken thereafter.

3.    Wendy Seidel, BCCYS's Director of In-Home Services, and Brian Jakubek, Director of Intake at BCCYS, were present at the meeting on August 9 but did not have specific authority over placement of children. The Court notes that as to these two defendants the Court asked Plaintiffs' counsel to cite a Supreme Court or Third Circuit case finding individuals similarly situated who have been or could have been held liable for civil rights violations. The resulting letter from counsel summarized the facts concerning these individuals, which was largely repetitive of what had been stated at oral argument, but did not cite any cases. For the reasons discussed below, the Court will grant summary judgment as to these two defendants.

4.    Two attorneys, Jennifer Grimes and Jennifer McCollum, who were also present at the meeting August 9, but from the undisputed facts they appear to have acted purely in their legal capacity, and were not decision-makers. Therefore, the Court will grant summary judgment as to them as well.

5.    Timothy L. Siminski, who was a BCCYS Caseworker Supervisor who directly supervised Clinton and High and approved of at least some of their conduct.

6.    Brandon N. Clinton, an BCCYS case worker who was personally involved in a number of the actions stated above.

7.    Kathleen M. High, a BCCYS case worker who was only involved in the temporary removal of one of the minor children from the home on September 2, 2012.

## I.    FACTUAL BACKGROUND & PROCEDURAL HISTORY

**A. Undisputed Facts**

On July 17, 2012, BCCYS received an anonymous report alleging past sexual and physical abuse of Plaintiffs' three now-adult children when they were minors.  On July 23, 2012, BCCYS caseworker Clinton went to Plaintiffs' home, accompanied by Cumru Township Police Officer James Griffith, to begin his investigation into the allegations of abuse.  Clinton spoke with Father at the home and with Mother and Parents' attorney over the phone.  Clinton told Parents and their attorney that they needed to come up with an arrangement for the care of the children during the pendency of the investigation.  It is disputed to what extent Clinton indicated to Parents that BCCYS would have the Children removed from the home if Parents did not accede to Clinton's demands that the Children be housed elsewhere during the investigation. Clinton Dep. 123:16-18.[1]  Parents eventually agreed to have D.P. stay with a family friend, and J.M. to stay with Mother's adult daughter Tammy Weaver.

---

[1] Clinton testified:
   Q: Did you ever at any point tell the [Parents] what could happen if they didn't do something to ensure the safety of the children?
   A: With respect to foster care or placement of the child?
   Q: Either.
   A: Yes, that would have probably been a discussion that I had.  We're looking at a way to assure safety. . . . One of the ways we can do that is to put a Safety Plan in place.  If that's not something that we can work out, you know, is there another way that we can handle this.  Can [Father] go someplace else. . . another option would be that maybe there's a place for the kids to go.  I think

On August 7, Plaintiffs provided Grimes with a copy of a letter from the Children's pediatrician stating that she evaluated J.M., reviewed his records, questioned him directly about abuse and she found no indication of abuse in the home and urged BCCYS to return the children. Pl's Ex. 42.

On August 9, 2012, the case was discussed at a meeting with Defendants Clinton, Siminski, Kovarie, Neider, Seidel, Jakubek, Grimes, McCollum, an agency paralegal, and two employees of the Pennsylvania DPW Northeast Regional Office (NERO), Jackie Maddon the Director of NERO Children, Youth & Families, and Brian Waugh, DPW Supervisor who both review child abuse cases with county agencies. After reviewing the facts of the case, it was "collaboratively" decided that Father could not have any contact with the Children until after he completed an offender evaluation. Grimes sent Parents' attorney an email notifying them of this decision. Defendants do not dispute that no person at the August 9 meeting believed there was sufficient evidence to file a dependency petition. Following this meeting, Defendants filed a Petition to Compel Father to submit to an offender evaluation on August 16, 2012. A hearing on the petition was scheduled for September 12, 2012.

On August 29, 2012 Parents emailed Grimes, Clinton, and others stating that they just learned it was BCCYS's position that the Children were "voluntarily" removed, so Parents were bringing them home. Pl's Ex. 28. Parents received no response from BCCYS to Mother's email and brought J.M. home on August 31, 2012.

On September 2, 2010, at 9:15 p.m. emergency caseworker Kathleen High called Mother after she got a report about possible a violation of a Safety Plan. Plaintiff's Ex. 35. After

---

initially, again that wasn't something that was—that they were willing to do. So conversation naturally then turns to, look, we need to figure out something because otherwise we run the risk of your kids coming into care."
Clinton Dep. 122:18-123:18.

determining there was no safety plan, High called again at 9:45 p.m., told Mother she needed to bring J.M. to Weaver's home that night. Pl's Ex. 35.[2] Parents complied and brought J.M. to Weaver's home that night.

On September 12, 2012, the Court of Common Pleas of Berks County held a hearing on BCCYS's Petition to Compel Father to complete an offender evaluation. The Petition did not address the status of the Children. But, Parents were able to present testimony about the Children's removal, and at the conclusion of the hearing the court ordered the Children be returned to Parents. The Court denied BCCYS's Petition to Compel, but it did authorize BCCYS to conduct unannounced home visits and have access to J.M. to ensure his safety.[3]

**B. Disputed Facts**

**1. Consent to remove the children**

The parties dispute whether Defendants' statements regarding "placement" of the Children were threats to remove the Children if Parents did not "voluntarily" remove them from the home. Defendants contend Plaintiffs at all times voluntarily agreed to place the children out of the home. Defendants point to testimony and case notes that say Parents agreed to place the Children outside of the home, and agreed that Father should have no contact with the Children. Parents and their attorney testified that Grimes and Clinton "threatened foster care if we don't have our children move to family or friends." Mother Dep. 192:8-17. Parents also point to the

---

[2] High testified that she told Mother that Father "cannot be around [J.M.]." High Dep. 24:13-22. High also testified that "I don't know if I said we would get a Court Order. I believe I said that to [Father] when I talked to him. The way that it went that night she was going to have to send the child back to Weaver." High Dep. 24:21-25:3.

Defendants contend this was merely a recommendation. Plaintiffs have presented at least some evidence that it was more than a recommendation. High testified she told Mother that "until the Court hearing on the 12th [of September] that the agency recommendation is that these children are to stay with their caretakers and not have any contact with [Father]." High Dep. 23:6-9. High clarified that this was not just a recommendation, but a requirement, "I mean, I recommended it but I was telling her that she also needed to have the[ Children] removed." High Dep. 24:13-15 ("I explained to her that [Father] cannot be around [the children].").

[3] Defendants filed a second Petition to Compel on November 16, 2012. Pl's Ex. 38. The Commonwealth Court granted the petition, but on appeal the Superior Court of Pennsylvania reversed because there was no probable cause to support the petition. Pl's Ex. 38.

statements by Clinton, Grimes, and High recounted above, in addition to the testimony and case notes of the August 9 meeting where all of the Defendants agreed Father could have no contact with the children.

Defendants do not dispute the testimony of Clinton and High that they both discussed the possibility of placement with Parents. Nor do they dispute that they told Parents they could not have contact with the Children.

**2. Source of Abuse Reports**

Defendants stated the individuals referred to as Child #1, Child #2 and Child #3 in the BCCYS reports were Father's three adult children. Plaintiffs dispute this fact, arguing Defendants have not produced evidence showing the identity of these individuals. Plaintiffs contend Defendants have not divulged the identity of the person who made the initial report of abuse. Only one of the Parents' adult children testified at the Petition to Compel hearing. Plaintiffs presented evidenced that this child made several false allegations of abuse in the past and had an ongoing dispute with Parents. Pl's Ex. 52.

**3. Entry into Plaintiff's Home**

The parties presented conflicting testimony regarding when Clinton and the police officer first entered Plaintiffs' home on July 23. Clinton testified that he entered after Father invited him and the police officer inside. Father testified that Clinton and the officer twice entered the home without permission before they were later invited inside. It is also disputed whether there was probable cause to enter the home without a warrant.

**C. Procedural History**

Plaintiffs brought claims against all Defendants for violation of their Fourteenth Amendment rights to procedural due process and substantive due process, their Fourth

Amendments rights to be free from search and seizure absent probable cause, and their First Amendment rights to familial association (ECF 1).[4] Defendants filed a motion to dismiss on January 25, 2013, which this court denied in part and granted in part, dismissing Plaintiff's Fourth Amendment claims for illegal entry against Defendants High, Grimes, and McCollum. D.M. v. Cnty. of Berks, 929 F. Supp. 2d 390, 402 (E.D. Pa. 2013).

After discovery, Plaintiffs have moved for summary judgment on their procedural due process claims against Clinton and High (ECF 68), and Defendants cross-moved for summary judgment on all of Plaintiffs' claims (ECF 70). These motions are presently before the Court.

### III.    ANALYSIS

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id. Under Rule 56, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in favor of the non-movant. Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)).

**A. Fourteenth Amendment**

**1. Procedural Due Process**

To state a claim under § 1983 for deprivation of procedural due process rights, a plaintiff must show that "(1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures

---

[4] These are technically all claims under the Fourteenth Amendment, as the Fourth and First Amendments hae been incorporated against the states under the Fourteenth Amendment.

available to him did not provide 'due process of law.'" Hill v. Borough of Kutztown, 455 F.3d 225, 233-34 (3d Cir. 2006). "We recognize the constitutionally protected liberty interests that parents have in the custody, care and management of their children." Croft v. Westmoreland Cnty. Children & Youth Servs., 103 F.3d 1123, 1125 (3d Cir. 1997); McCurdy v. Dodd, 352 F.3d 820, 827 (3d Cir. 2003); Stanley v. Illinois, 405 U.S. 645, 658 (1972).

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (internal quotations omitted). To determine what process is due, the court must balance the (1) "the private interests affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used, and probable value, if any, of additional procedural safeguards," and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Id. at 335.

Here, the private interest is a fundamental liberty interest in the care and custody of children. Croft, 103 F.3d at 1125. The Government has a compelling interest in protecting children from abuse. Id. at 1126 (noting removal of children can be justified even when later investigation reveals no abuse occurred, but "a state has no interest in protecting children from their parents unless it has some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse."). "Of course, '[t]he right to familial integrity . . . does not include a right to remain free from child abuse investigations.'" B.S. v. Somerset Cnty., 704 F.3d 250, 272-73 (3d Cir. 2013) (quoting Croft, 103 F.3d at 1125).

The Third Circuit considered the process due in a similar recent case where the state did not take custody of the child, but placed the child with her father. B.S. v. Somerset Cnty., 704 F.3d 250, 256 (3d Cir. 2013) (reversing summary judgment for the defendants on the plaintiff's procedural due process claim, but affirming summary judgment for certain individual defendants and on the plaintiff's substantive due process claim). Although the state child custody law required a hearing within 72 hours of removing a child from a parent's custody, the county did not believe a hearing was warranted because they placed the child with her father. Id. at 257. The district court granted summary judgment for the defendants because the child was not taken into state custody. Id. at 272. The Third Circuit reversed because the state was responsible for the deprivation, and "[f]rom the parent's perspective, there may be little meaningful difference between instances in which the state removes a child and takes her into state custody and those in which the state shifts custody from one parent to another, as occurred here." Id. at 272 ("In either case, the government has implicated a fundamental liberty interest of the parent who loses custody."). Moreover, there was a risk of erroneous deprivation that could not be corrected in the absence of state procedures. Id. Even if the procedures due were less than those required when a state took custody—which the court explicitly did not address—"that would not mean that no hearing was needed to address the deprivation effected by the removal of Daughter from Mother's custody." Id. at 272. "The delay should ordinarily be measured in hours or days, not weeks." Id. ("Speaking generally, however, it should be obvious that a hearing 40 days later is not sufficiently prompt.").

The Third Circuit concluded that the mother's petition for habeas corpus and the hearing on that petition forty days later was an inadequate procedural safeguard. Id. ("The constitutional deprivation at issue at this point is Daughter's initial removal from Mother's home, so being

heard much later, after the deprivation, fails to address the harm."). <u>Mathews</u> requires "an 'opportunity to be heard at a meaningful time and in a meaningful manner' to a parent deprived of custody." <u>Id.</u> (quoting <u>Mathews</u>, 424 U.S. at 333) ("Some courthouse somewhere may be open to someone aggressive and knowledgeable enough to initiate legal action, but that does not meet the state's burden of providing an 'opportunity to be heard at a meaningful time and in a meaningful manner' to a parent deprived of custody.").

This case presents the same balancing of interests and nearly-identical conduct by the state. The hearing did not occur for 51 days after the Children were removed; longer than the 40 days found unconstitutionally delayed in <u>B.S.</u>. Moreover, Defendants did not schedule the hearing to determine the placement of the Children, but instead to compel Father to submit to an offender evaluation. Accordingly, Defendants did not provide post-deprivation process at all. Even if this Court considered the Parents' opportunity to be heard at the Petition to Compel hearing, the delay in scheduling that hearing clearly exceeded the constitutional requirement for a prompt post-deprivation hearing.

Defendants raise two principal challenges contending this conduct did not violate Plaintiffs' procedural due process rights. First, that procedural due process does not require a hearing when the state does not take custody of the children. Second, that Parents consented to the removal of the Children.

**a. Non-custodial removal**

Defendants contend that no process is due when a child is not taken into the physical custody of the state. While Pennsylvania's Child Protective Services Law (CPSL) does not require a post-deprivation hearing under these circumstances, federal precedent does. <u>Cleveland</u>

Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985) ("The right to due process is conferred, not by legislative grace, but by constitutional guarantee.") (internal quotations omitted).

In B.S. the Third Circuit unequivocally stated "there may be little meaningful difference between instances in which the state removes a child and takes her into state custody and those in which the state shifts custody from one parent to another, as occurred here." B.S., 704 F.3d at 272 ("The state has caused a deprivation and risks having done so wrongly."). Relying on Loudermill, the Third Circuit explicitly rejected the proposition that no more process was due than the requirements under the CPSL. Id. at 273. "Therefore, assuming the 'fiscal and administrative burdens,' of affording such parents a prompt post-removal hearing do not outweigh the need for one—and it is hard to imagine when they would—such a hearing ought to be held." Id. at 272 (internal citations omitted).

**b. Consent to removal**

Defendants further contend that Parents consented to the removal of the Children in their home. But the Third Circuit rejected a similar contention in Croft, 103 F.3d at 1125 ("The threat that unless [father] left his home, the state would take his four-year-old daughter and place her in foster care was blatantly coercive."). A waiver of a constitutional right "must be voluntary, knowing, and intelligent . . . and must be established by 'clear' and 'compelling' evidence." Erie Telecommunications, Inc. v. City of Erie, Pa., 853 F.2d 1084, 1094 (3d Cir. 1988).

In Croft an agency case worker arrived to the plaintiff's home with a police officer and told the plaintiff that if he did not leave his home for the duration of the abuse investigation, his daughter would be removed from the home that night. Croft, 103 F.3d at 1124. The Third Circuit found "[t]he threat that unless [father] left his home, the state would take his four-year-old daughter and place her in foster care was blatantly coercive." Id. at 1125 n.1.

Plaintiffs produced evidence showing similar, but less extreme, facts in this case. Brandon Clinton testified that when he appeared at Plaintiffs' home he told Father that "we need to figure out something because otherwise we run the risk of your kids coming into [foster] care." Brandon Dep. 123:16-19 (explaining the other options were to put a safety plan in place, or for Father to leave the home). Plaintiffs have produced additional testimony, recounted above, demonstrating that "Clinton, Grimes, [and High] . . . told Parents that the children would be removed if they did not place them outside of the home." Clinton testified that Parents did not agree to placing the Children outside the home, so he explained to them that the Children could be placed into foster care if they did not "work something out." Clinton Dep. 122:18-123:18. Kathleen High testified that she told Mother on September 3, 2012 that Father could not be around the children and that Mother "need[ed] to have [the children] removed" from the home. High Dep. 24 at 13-22. High also testified that she told Father that she would get a court order if the children were not removed, but she is not sure whether she also said that to Mother. High Dep. 24:21-24. Since Plaintiffs have produced evidence from which a reasonable jury could find the removal was coercive and not voluntary, Defendants' motion for summary judgment on Plaintiff's procedural due process claim is denied.

Plaintiffs have a higher burden to succeed on their motion for summary judgment against Clinton and High. Plaintiffs must show there is no genuine question that the removal was coercive and not voluntary. As discussed above, Plaintiffs' evidence of coercion is not as strong as the evidence in Croft where the caseworker threatened to remove the child that very night. Croft, 103 F.3d at 1124. Here, Parents had legal counsel advising them through this process, and refused to sign a safety plan. These facts are certainly not determinative, but they do present a

13

genuine question whether removal was coercive.  Accordingly, Plaintiffs' motion for summary judgment shall also be denied.

**2. Substantive Due Process**

Parents have a "constitutionally protected liberty interest[] . . . in the custody, care and management of their children."  Croft, 103 F.3d at 1125 (reversing a grant of summary judgment for defendants).  Absent reasonable suspicion, the coerced removal of children from their parents is an "arbitrary abuse[] of power" that violates substantive due process rights under the Fourteenth Amendment.  Id. at 1126.  But "[t]he right to familial integrity. . . does not include a right to remain free from child abuse investigations."  Id. at 1125.

"The touchstone of due process is the protection of the individual against arbitrary action of government."  Wolff v. McDonnell, 418 U.S. 539, 558 (1974).  Only conduct that "shocks the conscience" is so arbitrary to impose constitutional liability.  County of Sacramento v. Lewis, 523 U.S. 833 (1998).  Government conduct is arbitrary and shocks the conscience when an agency  interferes with the parental relationship, without "some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse."  Croft, 103 F.3d at 1126.

In Croft the Third Circuit found an anonymous report of child abuse that was not corroborated by other evidence was not objectively reasonable grounds to believe the child had been abused or that abuse was imminent.  Croft, 103 F.3d at 1127 (finding the case worker was not "entitled to rely on the unknown credibility of an anonymous informant unless she could corroborate the information through other sources which would have reduced the chance that the informant was recklessly relating incorrect information or had purposely distorted information").

Accordingly, the decision to remove the child from the plaintiffs' home was "an arbitrary abuse of government power." Id.

The Third Circuit in Croft did not go on to consider whether the government's arbitrary abuse of power was conscious shocking. A subsequent Third Circuit case interpreting Croft held "decision-making by a social worker that is so clearly arbitrary . . . can properly be said to 'shock the conscience' and, therefore, violates the substantive due process rights of the affected family." Miller, 174 F.3d at 376.  A caseworker's conduct was not found to shock the conscious in Miller because the defendant had medical evidence, a video tape, a history of abuse and a doctor's opinion of abuse so the evidence showed the defendant "reasonably believed the children were in danger of abuse." Id. at 377 (upholding dismissal of plaintiffs' substantive due process claims).

This case lies somewhere in between.  Defendants' case notes show they relied on reports of abuse from Father's grown children that occurred approximately twenty years earlier.  Unlike Croft the reports were not anonymous, and there was more than one person who was the source of information.[5]  But, none of these reports suggested that J.M. or D.P. were ever abused.  The question is whether reports of abuse of different children twenty years earlier was an objectively reasonable basis to believe the Children were in imminent danger of being abused.

Plaintiffs have produced evidence that the reasonableness of the removal was questioned within BCCYS.  On August 2, 2012 a supervisor responsible for reviewing child welfare cases, Brian Waugh, wrote an email to Roseann Perry the BCCYS Bureau Director expressing concern that "[t]here are no identified threats, the child is assessed to be safe, and yet we have the child leaving the home."  Pl's Ex. 22.  Similarly, Perry wrote an email to DPW NERO Director Maddon  on August 10, 2012 questioning  "how did we go from a safety assessment that says no

---

[5] Although Plaintiffs have produced evidence that one of the adult children had a history of making false abuse reports, questioning the reliability of her account.

threats and the kids are safe to taking the position that there can be absolutely no contact with [Father]." Pl's Ex. 27.  Perry wrote in the same email, "This is a family who served as foster parents and even adopted a child from Berks CYS.  I am not disregarding what the adult siblings said occurred to them but over all of those years either there was no incidents or a lot of people missed things."  Pl's Ex. 27.  This evidence indicates even county officials were skeptical that there was a reasonable basis to believe Father posed a threat of imminent danger to the Children.

Unlike <u>Miller</u> there was no medical opinion the children were subject to abuse.  In fact, there was no evidence at all that the children were harmed. Furthermore, both the Commonwealth Court of Pennsylvania and the Superior Court of Pennsylvania on appeal denied Defendants' motion to compel Father to submit to an offender evaluation because there was insufficient evidence to support probable cause of abuse.  <u>In the Interest of:  D.P., A Minor</u>, No. 117-MDA-2013 (Pa. Super. Ct., Jan. 9, 2014) ("There was no allegation, let alone probable cause, to find a 'recent act' of physical abuse.").  A reasonable jury could find that it was so arbitrary to shock the conscience to remove children from their home based on reports that twenty years earlier Father abused other children, particularly in the absence of any reports or evidence the Children in this case were being harmed.

**B. First Amendment**

When a policy "significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." <u>Zablocki v. Redhail</u>, 434 U.S. 374, 388 (1978).  The Supreme Court has recognized that "[f]amily relationships, by their nature, involve deep attachments and commitments" and "relationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element

of personal liberty." Roberts v. U.S. Jaycees, 468 U.S. 609, 619-20 (1984). "Family relationships are the paradigmatic form of protected intimate associations." Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh, 229 F.3d 435, 441 (3d Cir. 2000) (quoting Roberts, 468 U.S. at 620).

It is uncontested that the protection of children from abuse is a compelling state interest. Croft, 103 F.3d at 1125. The central question is whether there was a less restrictive means to protect the Children from suspected abuse.

As discussed above, Plaintiffs have produced evidence supporting their contention that Defendants coerced them to remove their Children from their home for several months, which is a substantial interference with the right to familial association. Plaintiffs also produced evidence they proposed a more narrow approach to protect the Children—allowing supervised visits— which Defendants rejected. See, e.g., Grimes Dep. 51:1-55:16. Indeed, Waugh testified that he believed the Children's safety could be assured through supervised visits. Waugh Dep. 78:1-22; see also Pl's Ex. 27 (Perry's email to Maddon on August 10, 2012 stating, "I still do not understand why the agency will not permit contact between [Father] and the boys. The agency can supervise the visit themselves to assure there is no safety threat").

This evidence raises a genuine question of material fact whether Defendants could have ensured the Children's safety through less intrusive means than precluding all contact with the Children. If a jury finds that the agency had less intrusive means to protect the Children's safety, then the requirement to remove the Children from the home was not narrowly tailored to achieve that interest. Thus, Defendants' motion for summary judgment on Plaintiffs' First Amendment claim is denied.

**C. Fourth Amendment**

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." <u>Payton v. New York</u>, 445 U.S. 573, 586 (1980) (internal quotations omitted) ("As the Court reiterated just a few years ago, the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'"). One exception to the warrant requirement is consent to the search. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 223 (1973). Consent must be voluntary and not the product of duress or coercion. <u>Id.</u> at 227. "Voluntariness is a question of fact to be determined from all the circumstances." <u>Id.</u> at 248-49.

**1. Unlawful Entry**

Entry to a home without a warrant and without consent violates the Fourth Amendment. <u>See</u> <u>Cummings v. City of Akron</u>, 418 F.3d 676, 685 (6th Cir. 2005) (finding a Fourth Amendment violation where officers had no warrant, and the plaintiff indicated his lack of consent to entry by speaking to the officers through the window and then partially opening the front door); <u>State v. Reinier</u>, 628 N.W.2d 460, 468 (Iowa 2001) (considering the impact of the officers' uninvited entry into Reinier's porch "on the subsequent consent given by Reinier for the officers to search the remainder of the house").

There is a dispute of fact when Father invited Clinton and the police officer into Plaintiffs' home. Father testified Clinton entered the home twice before being invited inside. D.M. Dep. 161:1-8 & 162:18-164:24. Clinton testified that he did not enter the home until Father invited him inside. Clinton Dep. 130:13-132:11. These differing accounts present a genuine question of fact whether Clinton and the police officer entered Plaintiffs' home without

permission before Father invited them inside.  Neither party suggests there was probable cause to enter the home without a warrant.

**2. Unlawful seizure**

As this Court previously found, coercive removal of a child, even when the child is not taken into custody, can be a seizure under the Fourth Amendment. <u>D.M. v. Cnty. of Berks</u>, 929 F. Supp. 2d 390, 400 (E.D. Pa. 2013)  <u>Siliven v. Ind. Dep't of Child Servs.</u>, 635 F.3d 921, 926 (7th Cir. 2011); <u>Wallis v. Spencer</u>, 202 F.3d 1126, 1137 n.8 (9th Cir. 2000); <u>Tenenbaum v. Williams</u>, 193 F.3d 581, 604-05 (2d Cir. 1999).  Defendants do not contend that they had a warrant to seize the Children.  As discussed above, Plaintiffs have presented sufficient facts that a reasonable jury could find the Children were removed under threat of court action, which constitutes coercion.  Accordingly, Defendants' motion for summary judgment on Plaintiffs' Fourth Amendment claims shall be denied.

**D. <u>Monell</u> Liability**

Under <u>Monell v. Dep't of Social Serv.</u>, 436 U.S. 658, 694 (1978) "a municipality may only be liable for the torts of its employees in one of three ways." <u>McGreevy v. Stroup</u>, 413 F.3d 359, 367 (3d Cir. 2005).

> First, the municipality will be liable if its employee acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity; second, liability will attach when the individual has policy making authority rendering his or her behavior an act of official government policy; third, the municipality will be liable if an official with authority has ratified the unconstitutional actions of a subordinate, rendering such behavior official for liability purposes.

<u>Id.</u>  "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered."  <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 481-83 (1986).  A custom is an act "that has not been formally approved by an

appropriate decisionmaker, but that is so widespread as to have the force of law." Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003) (reversing the district court's grant of summary judgment). A plaintiff bears the burden to show the existence of a policy, and that a policymaker is responsible for the policy or has acquiesced to the custom." Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990).

The Third Circuit in B.S. found the testimony of agency employees supported a finding that it was "customary for the County to temporarily suspend the other parent's custody rights without a hearing, when abuse is suspected." B.S., 704 F.3d at 275 (reversing the grant of summary judgment to the county on the plaintiff's procedural due process claim, but affirming on her substantive due process and other claims). The plaintiff produced testimony from the director of youth services that the procedure used to remove the plaintiff's child from her custody without a hearing "is utilized in circumstances in which there is a 'fit-and-willing parent' to be 'given the right by the court to care for the child.'" Id. (quoting the testimony). In addition, a caseworker testified that this process was used several times a year. Id. The Third Circuit found this "evidence shows conclusively that, when a non-custodial parent is available to take a child, it is customary for the County to temporarily suspend the other parent's custody rights without a hearing, when abuse is suspected." Id.

Plaintiffs contend that BCCYS has a widespread custom of prohibiting suspected abusers from having contact with their children until the completion of an offender evaluation.[6] As in

---

[6]    Plaintiffs pled in their complaint that Director of BCCY, Kovarie, is a policymaker. But upon summary judgment Plaintiffs have not introduced any evidence showing Kovarie was authorized under Pennsylvania law to establish policies for BCCYS.
      "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." Pembaur v. City of Cincinnati, 475 U.S. 469, 481-83 (1986). Courts cannot "assum[e] that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." City of St. Louis v. Praprotnik, 485 U.S. 112, 125 n.1 (1988). The question of who is a "policymaker" is a question of state law. Andrews v. City of Philadelphia, 895 F.2d 1469, 1481 (3d Cir. 1990).

B.S. several BCCYS employees testified that this was the agency's "policy" or "protocol." Clinton agreed it was "the practice of CYS in situations similar to the one at issue in this case to, again, condition supervised contact or any contact upon completion of an offender evaluation." Clinton Dep. 174:16-20. Clinton testified "I have been doing this for 12 years and as we do our investigations in the process of ensuring safety, that's one of the steps that we take." Clinton Dep. 175:2-10. Clinton further testified this practice was BCCYS "policy" "[s]o I don't think that this is that unusual to say that contact would only occur pending the results of that evaluation." Clinton Dep. 194:19-195:1.

Maddon testified that "it was [BCCYS] protocol to prohibit contact until such an evaluation—until the individual undergoes a sex offender evaluation" and that this case was handled "as they would any other [case] of this type." Maddon Dep. 69:20-74:12 ("Their description was that this was the protocol for cases where they have allegations of sexual abuse."). Plaintiffs also produced an email Maddon sent to Roseanne Perry, the Director of the DPW Office of Children, Youth and Families, on August 10, 2012 stating, "In all cases such as this the evaluation which includes sex offender, violence offender with a polygraph element, is required before visitation." Pl's Ex. 27 (in an email to Perry earlier that same day, Maddon wrote, "I am not comfortable forcing the agency to do something different in this case as opposed to other similar cases as per their practice").

This evidence supports Plaintiffs contention that it was a widespread practice to prohibit contact with children until a person suspected of abuse completed an offender evaluation. Thus, Defendants' motion for summary judgment on the claims against Berks County is denied.

---

Absent evidence or authority showing Kovarie was a policymaker, her actions or ratification of subordinates' conduct is insufficient to impose municipal liability.

**E. Immunity**

**1. Absolute Immunity**

Officials "functioning as integral parts of the judicial process" are entitled to absolutely immunity from civil suits under § 1983. McArdle v. Tronetti, 961 F.2d 1083, 1084 (3d Cir. 1992). For example, state judges are absolutely immune from liability for their judicial decisions and state prosecutors are absolutely immune from liability for initiating prosecutions. Briscoe v. LaHue, 460 U.S. 325, 334 (1983). Absolute immunity depends on whether the challenged "actions [are] 'intimately associated with the judicial phase of the criminal process.'" Burns v. Reed, 500 U.S. 478, 486 (1991). "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." Id. at 486.

The Third Circuit has applied these principals to find state agents who brought a dependency proceeding were entitled to absolute immunity because they were performing judicial functions as advocates for the state. Ernst v. Child & Youth Servs. of Chester Cnty., 108 F.3d 486, 496 (3d Cir. 1997). The caseworkers were directly responsible for the decision to initiate the dependency proceeding, similar a state prosecutor's decision to initiate a prosecution. Id. The court characterized this as a "quasi-prosecutorial capacity." Id. at 497 ("[I]t is clear that all of the claims against the CYS defendants concern actions taken by the defendants in connection with the formulation and presentation of recommendations to the state court regarding Susanne's dependency status and disposition.").

In B.S. the Third Circuit considered the each of the individual defendants' conduct to determine whether it was prosecutorial in nature. B.S., 704 F.3d at 269. The court distinguished between a caseworker's conduct that was purely investigatory in nature, The court explained that investigating information for a "abuse report she prepared for the state

which, on its own, plainly would not," entitle her to absolute immunity because it was purely investigatory in nature.  Id. at 268-69 ("There would, in fact, be no serious basis for Eller to posit that she acted as a quasi-prosecutor had she never secured a temporary removal order from Judge Cascio or presented her report's conclusions to Judge Cascio after filing the report with the state, because her function in investigating potential child abuse and preparing a report required under state law does not approximate legal advocacy.").  But the fact that the investigation was prepared for a court dependency hearing where she argued on behalf of the county for the removal of the child before the court demonstrated she was acting as a legal advocate.  Id. at 269 ("[A]bsolute immunity protects not only caseworkers' presentations of their recommendations to a court, but also their "gathering and evaluation of information" to formulate those recommendations and to prepare for judicial proceedings." (quoting Ernst, 108 F.3d at 498).  Thus, the initial investigation of a report of abuse is a prosecutorial function when that investigation gathers facts used as the basis of a report advocating the removal of a child from the home.  Id.

Here there was no dependency proceeding.  Rather, Father was the subject of a petition to compel his participation in an offender evaluation.  This was an administrative action to further the investigation, and unlike the quasi-prosecutorial function involved in initiating a dependency proceeding.  Plaintiffs produced evidence that BCCYS did not consider seeking a dependency proceeding at any time.  As the court in B.S. explained, without this crucial component of legal advocacy in the dependency proceeding, there is no basis for finding a caseworker was acting as a quasi-prosecutor. Plaintiffs have produced sufficient evidence that Defendants were acting purely in an investigative capacity, and not as legal advocates.  Accordingly, Defendants are not entitled to absolute immunity.

**2. Qualified Immunity**

Government officials enjoy qualified immunity from suit under 42 U.S.C. § 1983 so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Sharrar v. Felsing, 128 F.3d 810, 826 (3d Cir.1997) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "A right is clearly established if its outlines are sufficiently clear that a reasonable officer would understand that his actions violate the right." Sterling v. Borough of Minersville, 232 F.3d 190, 193 (3d Cir. 2000). "[I]t is not necessary that there have been a previous precedent directly in point." Good v. Dauphin County Social Services for Children and Youth, 891 F.2d at 1092 (citations omitted); see also Doe v. County of Centre, Pennsylvania, 242 F.3d 437, 454 (3d Cir.2001) ("Rights may be clearly established even though the precise conduct at issue has not yet been declared unlawful.").

Citing to several unpublished district court cases, Defendants contend that the "law in this District" in 2012 did not require post-deprivation procedures for non-custodial removal of children from the home under the CPSL.[7] Puricelli v. Houston, No. 99-2982, 2000 WL 760522, at *11 (E.D. Pa 2000) ("This provision of the CPSL, however, only applies where the state has taken actual physical custody over a child."); Stone v. Brennan, No 06-468, 2007 WL 1199376 (E.D. Pa. Apr. 19, 2007) (finding "the Commonwealth of Pennsylvania's statutory procedure satisfies the procedural-due-process requirements of the Fourteenth Amendment"); see also Brown v. Daniels, No. 03-4242, 2006 WL 2060647, at *3 (E.D. Pa. June 15, 2006) ("Because Travonne was not in custody, Plaintiff was not entitled to a hearing [under state law] and as a result, she could not establish a procedural due process violation.") re'vd in part by 290 F. App'x

---

[7] The Third Circuit has held "there is no such thing as 'the law of the district.'" Threadgill v. Armstrong World Indus., Inc., 928 F.2d 1366, 1371 (3d Cir. 1991). To establish a clear constitutional right for purposes of qualified immunity, a clear, binding precedent must be issued by the controlling appellate court. Doe v. Delie, 257 F.3d 309, 321 (3d Cir. 2001) (considering district court cases as evidence of the law, but noting "[t]he absence of circuit precedent does not mean an official will always retain an immunity defense.").

467, 471 ("We agree with the District Court that Appellants did not set forth sufficient evidence at trial to support a finding that Travonne was taken into "protective custody" within the meaning of 23 Pa. Cons.Stat. Ann. § 6315. However, an inquiry into whether Appellants were afforded all of the process they were due cannot end there. It is well settled that state law does not define the parameters of due process for the purposes of the Fourteenth Amendment.").

First, the Supreme Court has held state law does not define the parameters of due process rights. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985) ("[O]nce it is determined that the Due Process Clause applies, the question remains what process is due. The answer to that question is not to be found in the [state] statute.").

Second, while B.S. was not decided until 2013, Croft and McCurdy clearly articulated the constitutional right to due process "anytime the state seeks to alter, terminate, or suspend a parent's right to the custody of his minor children." McCurdy, 352 F.3d at 827; Croft 103 F.3d at 1126 (explicitly rejecting that coerced removal was voluntary, and finding "the policy of removing the suspected parent from the family home during the pendency of child abuse investigations absent any procedural safeguards raises a procedural due process issue.").

Third, there is no question that in 2012 the constitutionally-protected parental interest was clearly established, and the right to due process before or after deprivation of a protected interest was clearly established. Indeed, based on these two principles alone, the Third Circuit has found that in a similar non-custodial removal of a child from the home "a reasonable BCCYS employee could not have believed that a post-deprivation hearing conducted seven weeks after the removal of a child from his parents' home complied with due process." Brown v. Daniels, 128 F. App'x 910, 916 (3d Cir. 2005) (vacating dismissal of the plaintiffs' procedural due process claim); see also Starkey v. York Cnty., No.11-00981, 2012 WL 9509712, at *10 (M.D.

Pa. Dec. 20, 2012) (granting summary judgment to plaintiffs because "precedent, particularly Croft, puts [the] Defendants on notice that procedural and substantive due process are triggered where a parent is removed from a home without any procedural safeguards").

Although unpublished Third Circuit opinions are not binding precedent, it is significant that the cases on which Defendants rely were clearly contradicted by Third Circuit at the time of the relevant events.[8] See, e.g., Miller v. City of Philadelphia, 174 F.3d 368, 376 (3d Cir. 1999) (noting that in Croft "a social worker threatened to remove a child from the home if the father himself did not leave. By threatening this action, the social worker effectively removed the child from the parents' custody").

Finally, a handful of contrary district court cases do not diminish the clear establishment of these constitutional rights. While district court precedent "may be relevant to the determination of when a right was clearly established for qualified immunity analysis," that is only in "the absence of binding precedent in this circuit." Doe v. Delie, 257 F.3d 309, 319 (3d Cir. 2001). The binding precedent in this Circuit clearly established the constitutional rights to child custody were infringed when non-custodial removal was coerced. There is no question that some procedure is due whenever there is a deprivation of a substantive right. Accordingly, as several other courts have found, it was not reasonable for Defendants to believe they could require the Children to be removed from the home and provide no procedure whatsoever.

**F. Supervisory Liability**

Supervisory liability can exist where the official exhibited "deliberate indifference to the plight of the person deprived." Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989). "Supervisory liability cannot be based solely upon the doctrine of respondeat superior, but there

---

[8] Is it also of note that two of the defendants in Brown, BCCYS and Brandy Neider, are defendants in this case. The Third Circuit instructed these defendants that it was not reasonable to believe due process allowed for the removal of a child from a home without a hearing for seven weeks. Brown, 128 F. App'x at 916.

must be some affirmative conduct by the supervisor that played a role in the discrimination." Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990) (citing Rizzo v. Goode, 423 U.S. 362, 377 (1976)). This affirmative conduct can be shown in three ways: a supervisor participated in the violation, a supervisor directed others to violate the plaintiff's rights, or the supervisor had "knowledge of and acquiesced in his subordinates' violations." Baker v. Monroe Twp., 50 F.3d 1186, 1190-91 (3d Cir. 1995). The Third Circuit requires a supervisor have "actual knowledge and acquiescence" of the constitutional violations of subordinates used to be liable for deliberate indifference to a subordinates' conduct. Id. "[T]he plaintiff must identify specific acts or omissions of the supervisor that evidence deliberate indifference and persuade the court that there is a 'relationship between the identified deficiency and the ultimate injury.'" Brown v. Muhlenberg Twp., 269 F.3d 205, 216 (3d Cir. 2001) (quoting Sample, 885 F.2d at 1118).

In A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr. the Third Circuit reversed summary judgment for child welfare supervisors because the case worker's incident reports provided notice to the supervisors that the child was being assaulted. 372 F.3d 572, 586 (3d Cir. 2004). This demonstrated actual knowledge. Id. The evidence also showed the supervisors "took little or no action to protect him [which] is sufficient to present a genuine issue of material fact as to their knowledge of and acquiescence in the conduct of the child-care workers." Id.

But no supervisory liability was found in Reedy v. Evanson where a supervisor was notified of a detective's decision to take criminal charges to the assistant district attorney, but did not review or approve of the charges before they went to the prosecutor. 615 F.3d 197, 231 (3d Cir. 2010) (affirming the grant of summary judgment because there was "no evidence that

Mannell directed Evanson to take or not to take any particular action concerning Reedy that would amount to a violation of her constitutional rights").

In a claim for hostile work environment, the Third Circuit court found the jury could conclude the supervisor had knowledge of the harassment, because "the name calling was so pervasive and the terms used were so outrageous" and the lewd images were in plain view. Andrews, 895 F.2d at 1479 (sustaining a jury verdict for the plaintiff against a supervisor). The court also upheld a verdict against the division head because he failed to investigate any of the claims of harassment and missing case files, and told the plaintiffs, "You have to expect this working with the guys." The court concluded this evidence demonstrated the supervisor acquiesced to the harassment Id.

Plaintiffs contend that Defendants Kovarie, Neider, Seidel, Jakubek, Siminski, Grimes and McCullom (Defendant supervisors) ratified the decision to prohibit contact between Parents and the Children until completion of an offender evaluation. In the August 9, 2012 case notes, BCCYS recorded a Petition Review meeting with Defendant supervisors, Clinton and others. At this meeting "[i]t was decided that any supervised contact between [Father] and the children . . . would only occur pending the review of the results of [Father's] evaluation." Pl's Ex. 34 (Petition Review meeting report). Neider and Clinton testified that this decision was made collaboratively, with everyone but the paralegal giving input. Clinton Dep. 193:3-195:9; Neider Dep. 122:23-124:10 (testifying that all the administrators present were "involved in the decision-making that occurred at the meeting" and going on to name Kovarie, Jakubek, Seidel, and Siminski). Clinton further testified that the details of the case were summarized at the meeting prior to the decision. Clinton Dep. 192:12-17 & 187:10-198:4.

First, Plaintiffs have not produced any evidence that Seidel and Jakubek had any authority to make decisions regarding the placement of children. Accordingly, they cannot be liable for ratifying a decision outside the scope of their authority. Similarly, Plaintiffs have not produced any evidence that the attorneys Grimes and McCollum were acting other than in their capacity as legal advisors. There is no evidence that they were authorized to make these decisions or that they were supervisors. Attorneys cannot be liable for the decisions their clients make. Absent any evidence that Grimes and McCollum were acting as supervisors and had authority to ratify the decisions or conduct of BCCYS employees, Plaintiffs cannot support their claims for constitutional violations against the Assistance County Solicitors.

As to the remaining supervisors, the Petition Review report, Pl's Ex. 34, and Clinton's testimony supports Plaintiffs' claims that Kovarie, Neider, and Siminski had actual knowledge Parents were prohibited from having contact with Children, and knowledge of the allegations and results of the investigation. The evidence also shows Kovarie, Neider and Siminski had authority to decide whether or not to prohibit contact. Kovarie Dep. 50:1-10. As discussed above, a reasonable jury could find that prohibiting all contact was not "narrowly tailored" to meet the compelling state interest in protecting the Children. See, e.g., Simiski Dep. 99:10-12 (testifying that "[t]here was never an allegation that [Father] did something to [J.M.] in the home or that he did anything to [D.P.] in the home."); Siminksi Dep. 140:14-17 (testifying that there would not necessarily have been any harm in permitting supervised visits). Accordingly, this evidence could allow a reasonable jury to find that Kovarie, Neider, and Siminski had knowledge of the attendant circumstances and ratified the decision to prohibit contact in violation of the First Amendment right to familial association.

But, there is no evidence that Kovarie, Neider, and Siminski had knowledge of Clinton's allegedly coercive statements to Parents. Unlike the caseworker reports summarizing the extensive abuse the child suffered in A.M., none of the caseworker reports in this case indicate that Clinton told Parents they must remove the children or risk having them "come into care." None of the testimony shows that any of the supervisors were aware of these statements. Clinton's direct supervisor, Siminksi testified that he did not know what caused Parents to agree to remove the Children, and that he did not "know what Mr. Clinton said to [Parents] in the home that day on the 23rd." Siminski Dep. 110:24-114:22. Siminski testified that he did not recall if Clinton ever informed him that he told Parents the Children would "come into care" if they did not work something out. Siminski Dep. 115:16-22. Neider testified that Clinton and Siminski informed him that Parents had "chosen to put the children somewhere else during the course of the investigation." Neider Dep. 76:11-16. Kovarie testified that he believed Parents "offered up" the arrangement "to move the children elsewhere." Kovarie Dep. 110:1-11.

Plaintiffs' claims for violation of procedural due process, substantive due process, and illegal seizure are based on a state deprivation of their constitutional rights through coercion. Absent evidence showing Kovarie and Neider had knowledge that the removal was coercive, Plaintiffs cannot show they are liable as supervisors for deliberate indifference to their constitutional deprivations.

There is some evidence showing Siminski had actual knowledge of the September 2 coercive removal. Siminksi testified that he reviewed High's report, Pl's Ex. 35, in which she wrote that High told Mother "she needs to agree to send [J.M.] back to his caretaker now to assure his safety." Siminski Dep. 140:17-25; Pl's Ex. 35. A reasonable jury could find that this

evidence and Siminksi's failure to respond to the coercive removal shows deliberate indifference.

Finally, Plaintiffs have not produced evidence that the Defendant supervisors had any knowledge that Clinton entered Plaintiffs' home without permission. Accordingly, Defendant supervisors cannot be liable for Plaintiffs' Fourth Amendment claim for illegal entry.

In sum, Defendants' motion for summary judgment will be granted on the following claims:

1. All claims against Wendy Seidel, Brian Jakubek, Jennifer Grimes, and Jennifer McCollum.

2. Plaintiffs' Fourth and Fourteenth Amendment claims against George Kovarie and Brandy Neider.

3. Plaintiffs' Fourth Amendment claims against Timothy Siminksi.

The following claims remain for trial:

1. Plaintiffs' procedural due process claims against Clinton, High, Siminksi, and the County of Berks.

2. Plaintiffs' substantive due process claims against Clinton, High, Siminksi, and the County of Berks.

3. Plaintiffs' First Amendment claims against Clinton, High, Siminksi, Kovarie, Neider, and the County of Berks.

4. Plaintiffs' Fourth Amendment claims for illegal seizure against Clinton, High, Siminski, and the County of Berks.

5. Plaintiffs' Fourth Amendment claim for illegal entry against Clinton.

**G.  Rights to Foster Child D.P.**

Defendants contend that Plaintiffs cannot bring constitutional claims for conduct related to D.P. because he is a foster child, so there is a diminished liberty interest in that familial relationship. Smith v. Org. of Foster Families For Equal. & Reform, 431 U.S. 816, 845 (1977) ("Here, however, whatever emotional ties may develop between foster parent and foster child have their origins in an arrangement in which the State has been a partner from the outset.").  But OFFFER does not stand for the proposition no constitutional protections extend to foster families.  Id. at 846 (declining to answer the "complex and novel questions" because the district court erred in finding the pre-removal procedures constitutionally defective Rather, the Court found that "the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in 'promot(ing) a way of life' through the instruction of children, as well as from the fact of blood relationship."  Id. at 844 ("No one would seriously dispute that a deeply loving and interdependent relationship between an  adult and a child in his or her care may exist even in the absence of blood relationship.").  The Court noted an important distinction with foster families was the state's intervention in creating the family.  Id. at 845.  Accordingly, "the New York statutes and the contracts executed by the foster parents" shaped the contours of the right.  Id. at 846.  Finally, the Court found that the competing rights of the natural parents "substantially attenuated" the foster family's rights "where the proposed removal from the foster family is to return the child to his natural parents."  Id. at 847.

A number of other circuits have found OFFER to stand for the proposition that state law creates the liberty interest in foster families.  See, e.g., Rodriguez v. McLoughlin, 214

F.3d 328, 337 (2d Cir. 2000). (relying on <u>OFFER</u> to hold that "any liberty interest arising in the preservation of a biologically unrelated foster family would arise, if at all, only under state law and not under the Due Process Clause itself"); <u>Elwell v. Byers</u>, 699 F.3d 1208, 1214 (10th Cir. 2012) ("For state law to create a liberty interest, it must establish substantive predicates to govern official decisionmaking and mandate an outcome when relevant criteria have been met."); <u>Drummond v. Fulton Cty. Dept. of Family, etc.</u>, 563 F.2d 1200, 1206 (5th Cir. 1977); <u>Kyees v. Cnty. Dep't of Pub. Welfare of Tippecanoe Cnty.</u>, 600 F.2d 693, 698 (7th Cir. 1979). <u>Cf.</u> <u>Gibson v. Merced Cnty. Dep't of Human Res.</u>, 799 F.2d 582, 587 (9th Cir. 1986) (noting "[t]he Fifth, Sixth, and Seventh Circuits have relied on the distinguishing factors discussed by the <u>OFFER</u> majority to support rulings that foster parents do not possess a constitutionally protected liberty interest in the maintenance of the foster family relationship" but not reaching a determination).

The Third Circuit has not considered the issue, but Judge Hannum of this Court found foster parents had standing to bring constitutional claims against a city agency for removing their foster child from their care. <u>McLaughlin v. Pernsley</u>, 654 F. Supp. 1567, 1584 (E.D. Pa. 1987). Neither party has briefed this Court on the relevant Pennsylvania foster parent statutes or contracts with Plaintiffs to indicate the contours of any state-created liberty interests. Since it is clear there is a familial right to foster children, and the limitations on that right, if any, are subject to remaining questions of fact, Defendants are not entitled to summary judgment on Plaintiffs' claims based on D.P.

## IV.   CONCLUSION

Defendants' motion for summary judgment in favor of Defendants Grimes, McCollum, Jakubek and Seidel is granted.  Defendants' motion for summary judgment on Plaintiffs' First Amendment, Fourteenth Amendment, and Fourth Amendment claims are granted in part and denied in part.  As to the remaining claims, given the significant disputes of material facts surrounding the removal of the children, both parties' motions for summary judgment on Plaintiffs' procedural due process claim are denied.

O:\CIVIL 12\12-6762 D.M. v. couty of berks\12cv6762.072413.memo.msj.docx